Steven AUSTIN, et al., Plaintiffs,

v.

**PENNSYLVANIA DEPARTMENT OF CORRECTIONS, et al.,
Defendants.**

Civ. A. No. 90–7497.

United States District Court,
E.D. Pennsylvania.

Jan. 17, 1995.

Alvin J. Bronstein, Elizabeth R. Alexander, David Fathi, Washington, DC, David Rudovsky, Stefan Presser, Scott Burris, Angus R. Love and Robert W. Meek, Philadelphia, PA, for plaintiffs.

Francis R. Filipi and Linda C. Barrett, Sr. Deputy Attys. Gen., and R. Douglas Sherman, Denise A. Kuhn and Pia D. Taggart, Deputy Attys. Gen., Harrisburg, PA, for defendants.

DuBOIS, District Judge.

## ORDER

**AND NOW,** to wit, this 5th day of January, 1995, upon consideration of the Stipulation of Dismissal Pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii), the Proposed Settlement Agreement, as amended, Plaintiffs' Memorandum of Law in Support of Proposed Settlement Agreement, Defendants' Memorandum of Law in Support of the Proposed Settlement Agreement, the objections of class members received by the Court between August 9, 1994, and the date of this Order,[1] and all other documents to which reference is made in this Court's Memorandum which will be filed on or before January 17, 1995, following a hearing on December 12 and 13, 1994, at which time the Court received testimony from designated

---

1. All written objections from class members received by the Court were docketed.

class representatives and other class members concerning the Proposed Settlement Agreement, for the reasons summarized below and set forth in more detail in the Court's Memorandum which will be filed on or before January 17, 1995, **IT IS ORDERED** as follows:

1. Members of the plaintiff class were given adequate notice of the proposed settlement, the proposed dismissal of the action without prejudice, their right to file objections, the manner of filing objections, and the hearing on the proposed settlement scheduled for December 12, 1994 and December 13, 1994, pursuant to Federal Rule of Civil Procedure 23(e) and Orders of the Court dated September 20, 1994, November 21, 1994 and November 29, 1994;

2. The Settlement Agreement fairly, reasonably and adequately advances and protects the interests of the plaintiff class and is **APPROVED** pursuant to Federal Rule of Civil Procedure 23(e). The Court's review of the Settlement Agreement was conducted solely to comply with Federal Rule of Civil Procedure 23(e) and does not convert the Settlement Agreement into an order of the Court or a consent decree;

3. The Stipulation of Dismissal without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii), except for plaintiffs' claims regarding tuberculosis control which will be covered by a subsequent order, is **APPROVED** in accordance with Federal Rule of Civil Procedure 23(e);

4. Any plaintiff, including those plaintiffs who filed objections or wrote letters to the Court which stated personal or individual concerns, may at any time file a new complaint raising some or all of the issues presented in this action, and any other issues justiciable in this Court. Because this Court has dismissed the action, plaintiffs are now informed that the Court no longer has jurisdiction to consider individual objections or individual correspondence relating to the action;[2]

5. If within three (3) years of the date hereof the plaintiffs, by their current counsel, file a new action on any issues presented by this action, the new action will be considered a "related case" and assigned to this Court;

6. All discovery that has been provided by the parties in this action shall be deemed to be part of discovery in any new action filed in accordance with paragraph 5 above. Plaintiffs' counsel may maintain control and custody of all discovery provided to date. Plaintiffs' counsel shall continue to comply with the provisions of all protective orders; and,

7. If any of the corrections issues that were the subject of testimony in the trial of the corrections phase of this case are raised in a new action filed pursuant to paragraph 5 above, the testimony and evidence introduced in the corrections phase of this case shall be admissible on the merits in the new action.

**IT IS FURTHER ORDERED** that (a) all pending motions of class members to intervene, some of which were filed as objections to the proposed settlement, are **DENIED** on the ground that there is no need for class members to intervene as all objections filed by class members were considered by the Court, (b) all pending motions of class members for appointment of counsel, some of which were filed as objections to the proposed settlement, are **DENIED** on the ground that there is no basis for appointment of counsel for individual class members, the entire class being adequately represented by class counsel, (c) all pending motions of class members to enjoin the proposed settlement, some of which were filed as objections to the proposed settlement, are **DENIED** for the reasons set forth above and in the Court's Memorandum which will be filed on or before January 17, 1995, and (d) all other pending motions related to the proposed settlement, some of which were filed as objections to the proposed settlement, are **DENIED.**

**IT IS FURTHER ORDERED** that notice of the provisions of the within Order shall be provided by defendants to members of the plaintiff class and other inmates in the state

---

2. The parties, through counsel, have agreed to continue to investigate certain individual claims designated by the Court and to report to the Court after they have done so.

correctional system who are affected by the
Order by posting such notice in appropriate
places in state correctional institutions.

## Table of Contents

I. BACKGROUND.........................................................1444
 A. The Parties....................................................1444
 B. The Pennsylvania Correctional System ..........................1444
 C. Plaintiffs' Claims ............................................1444
 D. Procedural History/Motions for Preliminary Injunction and Summary
 Judgment.......................................................1445
II. The Settlement Agreement ...........................................1447
 A. Summary of Negotiations .......................................1447
 B. Enforceability/Monitoring......................................1448
 C. Medical Care ..................................................1449
 1. Staffing .................................................1449
 2. Policies and Procedures ..................................1449
 3. Equipment and Facilities .................................1450
 4. Quality Assurance.........................................1450
 5. Monitoring ...............................................1450
 D. Mental Health Care ............................................1450
 E. Corrections ...................................................1451
 1. Access to the Courts......................................1451
 2. Excessive Force Claims ...................................1451
 3. Jobs and Educational Opportunities .......................1451
 4. Sex Offender Programs ....................................1453
 5. Monitoring ...............................................1453
 F. HIV/AIDS ......................................................1453
 G. Environmental/Fire Safety .....................................1454
 H. Attorneys' Fees ...............................................1454
III. DISCUSSION .........................................................1454
 A. Notice to Class Members .......................................1455
 B. Court Approval ................................................1456
 1. Complexity, Expense and Likely Duration ..................1457
 2. Reaction of the Class ....................................1458
 a. Medical Care ........................................1458
 (1) Peer Review Committee ..........................1458
 (2) Adequacy of Care...............................1458
 (3) Emergency Procedures ...........................1458
 (4) Staffing .......................................1460
 b. Mental Health Care ..................................1460
 (1) Confidentiality ................................1460
 (2) Special Needs Units ("SNUs") and Mental Health Units
 ("MHUs") .......................................1460
 c. Corrections .........................................1461
 (1) Access to the Courts............................1461
 (2) Excessive Force Claims .........................1462
 (3) Jobs and Educational Opportunities..............1463
 (4) Sex Offender Programs...........................1464
 d. HIV/AIDS ............................................1464
 (1) Discrimination .................................1464
 (2) Privacy........................................1466
 (3) Miscellaneous Objections .......................1467
 e. Environmental/Fire Safety............................1467
 f. Overcrowding ........................................1468
 g. Enforceability ......................................1468
 h. Attorneys' Fees .....................................1469
 3. Stage of the Proceedings .................................1470
 4. Risks of Establishing Liability ..........................1471
 5. Defendants' Ability to Endure Greater Judgment............1471

6. Range of Reasonableness of the Settlement Fund .................. 1472
7. Recommendation of Class Counsel................................ 1472

IV. CONCLUSION ................................................... 1473

---

## MEMORANDUM

DuBOIS, District Judge.

This is a class action brought pursuant to 42 U.S.C. § 1983 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended, seeking declaratory and injunctive relief. Presently before the Court is the parties' joint request for approval of a Settlement Agreement pursuant to Federal Rule of Civil Procedure 23(e). For the following reasons, the Settlement Agreement will be approved.

## I. BACKGROUND

### A. The Parties

The named plaintiffs are inmates who, at the time the initial Complaint was filed, November 27, 1990, were incarcerated at thirteen state correctional institutions throughout the Commonwealth of Pennsylvania.[1] On March 5, 1992, the Court certified a class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure consisting of all persons who are now or who will in the future be confined by the Pennsylvania Department of Corrections ("DOC") in a facility other than State Correctional Institution ("SCI")–Muncy or SCI–Pittsburgh.[2]

The named defendants are Joseph Lehman, Commissioner of the DOC, the thirteen superintendents of the correctional institutions named in the initial Complaint, and Robert Casey, Governor of the Commonwealth of Pennsylvania.

### B. The Pennsylvania Correctional System

The DOC is responsible for management and day to day operation of all correctional institutions in the Commonwealth of Pennsylvania. During the four years this case has been ongoing, the number of inmates committed to correctional institutions in Pennsylvania has increased from approximately 18,000 in November, 1990, to more than 27,000 in November, 1994. The number of correctional institutions at which these inmates are housed has increased from fifteen to twenty-two.[3]

Twenty institutions house male inmates only. Two institutions, SCI–Cambridge Springs and SCI–Muncy, house only female inmates. Two of the correctional institutions are designated as diagnostic and classifications centers. SCI–Camp Hill is the central diagnostic and classification center for male inmates; SCI–Muncy is the diagnostic and classification center for female inmates. At the diagnostic and classification centers, recently convicted inmates and parole violators are processed and then transferred to other correctional institutions.

### C. Plaintiffs' Claims

In their Second Amended Complaint plaintiffs allege the following: (1) all of the state correctional institutions are severely overcrowded, causing such physical and psychological harm and deprivation as to render incarceration unconstitutional; (2) as a direct result of the overcrowding, violence between

---

**1.** The thirteen institutions are State Correctional Institution ("SCI")–Camp Hill, SCI–Cresson, SCI–Dallas, SCI–Frackville, SCI–Graterford, SCI–Greensburg, SCI–Huntingdon, the State Regional Correctional Facility at Mercer, SCI–Retreat, SCI–Rockview, SCI–Smithfield, SCI–Waymart, and SCI–Waynesburg.

**2.** SCI–Pittsburgh is involved in an ongoing case, *Tillery v. Owens,* 719 F.Supp. 1256 (W.D.Pa. 1989), *aff'd* 907 F.2d 418 (3d Cir.1990), *cert. denied, Mikesell v. Morgan,* 502 U.S. 927, 112 S.Ct. 343, 116 L.Ed.2d 283 (1991). SCI–Muncy

is covered by the consent decree in *Beehler v. Jeffes,* 664 F.Supp. 931 (M.D.Pa.1986), *aff'd without op., Beehler v. Lehman,* 989 F.2d 486 (3d Cir.1993).

**3.** The seven newly-opened institutions are SCI–Albion, SCI–Cambridge Springs, SCI–Coal Township, SCI–Green County, SCI–Mahanoy, SCI–Somerset and Quehanna Motivational Boot Camp. Two other institutions, SCI–Chester County and one in Clearfield County, are in the planning stage.

inmates and between inmates and staff is at a greater frequency than at any other time in the past; (3) there is a pattern and practice of excessive, malicious and unjustified use of force by correctional officers against inmates, which the defendants have failed to discipline or otherwise control; (4) the DOC's classification scheme, which insures that less aggressive inmates will not be housed with more violent inmates, is in complete disarray; (5) there are not enough staff members to conduct sufficient chemical abuse, sex offender and educational programs; (6) access to programs and job openings is granted in a racially biased manner; (7) access to the sex offender programs, upon which the Pennsylvania Board of Probation and Parole generally conditions release, requires an admission of guilt; (8) the general lack of educational, recreational or employment opportunities results in pervasive idleness and contributes to the level of violence; (9) the DOC systematically fails to provide necessary routine and emergency medical care to its population because of a lack of medical staff, equipment and adequate training; (10) inmates with disabilities are often not provided proper physical therapy and/or assistance needed to participate in correctional institution activities; (11) the manner in which the DOC administers health care, by contracting with outside providers at a fixed rate, leads to financial incentives for the providers to deny necessary care or provide necessary care only after lengthy delays; (12) the facilities, staff and procedures in the DOC's mental health care units are all seriously deficient; (13) inmates are not provided with information they need to protect themselves and others from HIV transmission; (14) HIV-infected inmates are not informed of the benefits of early identification of their condition or provided with adequate medical treatment; (15) the DOC does not maintain the anonymity of HIV-infected inmates; (16) HIV-infected inmates are segregated from other inmates; (17) HIV-infected inmates are denied the opportunity to take certain jobs such as food worker or barber solely because of their handicap; (18) environmental, health and fire safety standards are not met; and (19) inmates' access to the courts is restricted by inadequate training, assistance and facilities.

Plaintiffs allege that these policies, practices, acts and omissions, taken as a whole, constitute deliberate indifference to plaintiffs' rights under the United States Constitution and 42 U.S.C. § 1983, thereby depriving plaintiffs of their rights: (1) to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments; (2) to be free from excessive and malicious physical force and violence under the Fourth, Eighth and Fourteenth Amendments; (3) to proper and necessary medical and psychiatric services under the Eighth and Fourteenth Amendments; (4) to be free from deprivations of liberty and property without due process of law under the Fourteenth Amendment; (5) to equal protection of the laws under the Fourteenth Amendment; (6) to access to counsel and the courts under the First, Sixth and Fourteenth Amendments; and (7) to privacy and autonomy under the First, Fourth, Ninth and Fourteenth Amendments.

Plaintiffs allege that defendants' actions also violate Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended by the Civil Rights Restoration Act of 1987, by (1) denying otherwise qualified HIV-infected plaintiffs the benefits of participation in programs and activities available to other inmates; (2) exposing HIV-infected plaintiffs to harassment and discrimination, solely on the basis of their handicap; (3) failing to make DOC facilities and programs accessible to otherwise qualified handicapped individuals; and (4) failing to make reasonable accommodation to the special needs of such persons. Plaintiffs seek declaratory and injunctive relief.

### D. Procedural History/Motions for Preliminary Injunction and Summary Judgment

On November 27, 1990, plaintiffs filed their initial Complaint. Before defendants filed a response, plaintiffs amended their complaint as a matter of course. Plaintiffs, with leave of court, filed a Second Amended Complaint on September 16, 1991, adding eight inmates

as plaintiffs.[4] On August 6, 1992, while discovery was ongoing, plaintiffs filed a Motion for a Preliminary Injunction by which they sought to enjoin the defendants to establish an appropriate program for diagnosis, treatment and control of tuberculosis ("TB") in the thirteen institutions named in the Second Amended Complaint and SCI–Muncy.

In May of 1991, prior to plaintiffs' Preliminary Injunction Motion, the DOC initiated a review of the previous TB Policy in response to concerns raised by the Department of Health with respect to TB control in the Pennsylvania correctional system. That review led to the adoption of a new TB policy entitled *Clinical and Administrative Guidelines for the Prevention and Management of Tuberculosis*, effective on September 4, 1992 ("1992 TB Policy").

The 1992 TB Policy provided for: (1) TB testing of all inmates upon entry into a correctional institution and annual testing thereafter based on the inmates' date of entry; (2) preemployment and annual testing for employees; (3) segregation of new inmates pending completion of TB screening; (4) preventive therapy for inmates with inactive TB infection and monitoring for adverse reaction to therapy; (5) isolation and treatment for inmates with active TB; (6) computerized medical record keeping for purified protein derivative ("PPD") test dates, results and follow-up treatment; (7) automated status reports generated on a daily and monthly basis and reporting procedures . for active cases of TB; (8) annual education and training in TB prevention and control for inmates and employees and documentation of such training upon completion; (9) measures to prevent the transfer of inmates without medical clearance; (10) segregation of inmates who refuse to comply with screening and testing procedures; (11) semi-annual screening of inmates known to be HIV-infected; and (12) procedures for investigating incidents of conversion from negative to positive PPD status.

A hearing on plaintiffs' Motion for Preliminary Injunction was held on September 9, 10 and 11, 1992. At the hearing Dr. Armand Start, plaintiffs' expert, testified that the 1992 TB Policy was an "excellent document" that addressed all of the major elements of any TB control program. The DOC presented evidence that it had begun implementation of the 1992 policy and planned to institute a quality assurance program to ensure its effectiveness and complete implementation. Under those circumstances, the Court granted plaintiffs' Motion on September 29, 1992, enjoining defendants to implement the 1992 TB Policy and making no findings on the issue of deliberate indifference before the adoption of the new policy.

The parties engaged in extensive discovery on all aspects of the case. Based on this discovery and supported by affidavits from correctional institution officials and expert witnesses, defendants filed a Motion for Summary Judgment on correctional and environmental issues on June 25, 1993. On July 1, 1993, plaintiffs filed a Cross–Motion for Summary Judgment on two HIV-related issues—whether defendants violated plaintiffs' constitutionally protected right of privacy in disseminating confidential medical information concerning inmates who are HIV-positive and whether the defendants violated the Rehabilitation Act of 1973, as amended, by routinely denying food service, personal care and other jobs to HIV-positive inmates without justification or individualized consideration. Both motions were denied by the Court.

The Court ordered that the case be tried non-jury in four phases: corrections, environmental, medical care, and mental health. Between December 6, 1993 and January 3, 1994 the parties tried part of the corrections phase. On January 3, 1994, the Court continued the corrections phase at the joint request of the parties so as to give them additional time to conduct settlement discussions.

4. Plaintiffs' Motion for Leave to File a Third Amended Complaint naming the Superintendent of SCI–Muncy as a defendant was denied by Order dated September 29, 1992. Similarly, by Memorandum and Order dated January 7, 1993, the Court denied plaintiffs' Motion for Leave to File a Fourth Amended Complaint in order to add five medical and mental health care contractors as defendants.

## II. The Settlement Agreement

### A. Summary of Negotiations [5]

Settlement discussions began in the first week of December, 1993. Plaintiffs' counsel, under the direction of David Rudovsky, drafted a proposed Settlement Agreement that was submitted to the defendants on December 7, 1993. Defendants responded with a written counterproposal on January 15, 1994. Plaintiffs, in turn, responded to that document on January 31, 1994.

During February, 1994 the parties exchanged a series of letters regarding certain procedural matters that had to be resolved prior to any substantive agreement. Following resolution of these procedural matters, the parties decided that further negotiations should proceed separately on each substantive issue between the attorneys assigned to handle each such issue. Mr. Rudovsky took responsibility for overseeing the negotiations for the plaintiffs and for drafting and negotiating the substantive proposals in the corrections area. Mr. Rudovsky also handled plaintiffs' negotiations concerning the form of the settlement, fees, conditions for dismissal and related issues. Mr. Rudovsky spent in excess of 250 hours on these matters.

In the corrections area, Mr. Rudovsky and Stefan Presser, another attorney representing plaintiffs, worked through numerous draft proposals with defense counsel, Francis Filipi. A substantial amount of time was expended on the issue of providing access to the courts, specifically on how many paralegals would be hired and what part of the DOC's inmate population they could assist. Additionally, there were numerous telephone conferences dealing with the responsibility of the Special Investigation Office, the branch of the DOC which investigates inmates' grievances relating to abuse by corrections officers. There were also extensive negotiations over the number of additional jobs which the DOC would provide. Plaintiffs sought the guidance of their expert witness, Patrick McManus, on the latter issue.

With regard to the medical issues, on March 11, 1994, the defendants responded to the medical provisions of the plaintiffs' January 31, 1994, proposal. Subsequently, in March, 1994, the defendants provided a number of documents with information regarding medical budgets, staffing and equipment inventories at the various institutions. Following further correspondence and oral communications, plaintiffs' counsel, Elizabeth Alexander, sent defendants a revised proposal on April 15, 1994. Defendants responded on April 19, 1994. Face-to-face negotiations were conducted in Harrisburg on May 4 and 5, 1994, between Ms. Alexander and defense counsel, Linda Barrett, after which the parties reached substantial agreement on most of the medical provisions of the Agreement. A few minor issues, such as the content of certain monitoring documents, were resolved in June 1994. During the negotiations, Ms. Alexander discussed the medical proposals with plaintiffs' medical experts on at least eleven occasions. She spent a total of 103.6 hours in connection with the negotiation of the medical issues.

In the mental health area, counsel exchanged at least 20 drafts of the Settlement Agreement over the course of the negotiations. There were at least 30 telephone conferences between plaintiffs' counsel and defendants' counsel solely on mental health issues. Plaintiffs' counsel conferred with their mental health experts on at least 15 separate occasions during the negotiations.

With regard to the HIV/AIDS issues, the general outline of a settlement on the employment discrimination issues was developed by April, 1994, in a series of conversations, memoranda and letters between plaintiffs' counsel, Scott Burris, and defendants' counsel, Francis Filipi. However, the parties reported an impasse shortly thereafter when defendants refused to eliminate the contagious disease notification policy without the agreement of its unionized employees, the corrections officers. In response, plaintiffs advised the Court that they were prepared to renew their Motion for Summary Judgment, or to proceed to trial, on that issue.

---

**5.** The parties provided a summary of their settlement negotiations in letters dated December 16, 1994 (plaintiffs), and December 19, 1994 (defendants). Copies of the letters have been docketed.

In June, 1994, the Court referred the HIV/AIDS aspect of the case to the Honorable Thomas N. O'Neill, Jr., for mediation. The parties included in the discussions with Judge O'Neill representatives of the American Federation of State, County and Municipal Employees ("AFSCME"), the correctional officers' labor union. After two long meetings, the parties reached agreement on all such issues.[6]

Regarding the environmental aspects of the case, plaintiffs initially relied heavily on their expert reports. The proposal submitted to defendants on environmental matters took into account the changes that had already been made by defendants and documented in affidavits attached to Defendants' Motion for Summary Judgment. These affidavits, provided by the superintendents of the named institutions, addressed the more pressing concerns raised by plaintiffs' experts, many of which were corrected promptly by defendants.

Defendants' responded to plaintiffs' initial settlement proposal on environmental issues with a counteroffer in mid-January, 1994. Plaintiffs' counsel reviewed the proposal in its entirety with their expert team leader, Ward Duel, and continued to consult with him on a number of technical issues such as asbestos problems, flammability of mattresses, ventilation issues, sanitary fixture ratios and monitoring issues. Over the next several months numerous draft proposals were exchanged.

Given the extensive history of the negotiations set forth above and the Court's close involvement with the settlement process through the scheduling of regular status conferences by telephone, it is evident that counsel strongly represented the interests of their clients. At all times the negotiations were highly adversarial and professional. Virtually every provision of the Settlement Agreement underwent numerous changes. For all such reasons, the Court finds the Settlement Agreement was the result of vigorous arm's-length negotiations.

## B. Enforceability/Monitoring

From the inception of the litigation the defendants were adamant about their unwillingness to enter into a consent decree or any form of agreement directly enforceable by the Court. The parties therefore agreed to a dismissal without prejudice combined with extensive monitoring by plaintiffs' counsel at defendants' expense. The Settlement Agreement provides that all claims except those relating to TB will be dismissed without prejudice contemporaneously with Court approval. The preliminary injunction issued September 29, 1992, regarding TB control will remain in effect until June 30, 1995, at which time the parties agreed the injunction will be vacated and the TB-related claims dismissed without prejudice provided that the DOC is in substantial compliance with the injunction.

The defendants agreed to make "all good faith efforts" to effectuate the provisions of the Settlement Agreement, see Settlement Agreement ¶ 231(a), and plaintiffs are permitted to file a new complaint raising some or all of the issues presented in this action, as well as any other issues justiciable in the Court, at any time. The agreement itself, however, states unequivocally that it is "not enforceable by the plaintiffs or plaintiff class." See id. ¶ 231. In the event the DOC fails to perform its obligations under the Settlement Agreement, plaintiffs' only remedy is to reinstitute suit.

This mutually dependent arrangement allows the parties to be reasonably confident that the Settlement Agreement will be observed and provides added flexibility because it does not involve the Court in the micromanagement of the corrections institutions. Although the members of the plaintiff class will not be able to seek the Court's assistance in enforcing the Settlement Agreement, they also will not be precluded from bringing subsequent suits for monetary or injunctive relief.

The Agreement provides for submission by plaintiffs' counsel of quarterly statements setting forth the time and costs expended in

---

**6.** The Court also referred certain issues relating to access to the courts to Judge O'Neill for mediation. After the parties overcame their impasse on the HIV/AIDS issues, however, they were able to resolve the remaining issues without further assistance from Judge O'Neill.

connection with monitoring defendants' compliance. Plaintiffs' counsel agreed to discount their normal fees by 50%. The parties estimate that monitoring costs will not exceed $60,000 per year. In the event plaintiffs' current counsel bring suit on any of the issues presented in this action within three years, the newly filed action will be considered a related case under the Local Rules of Civil Procedure and will be assigned to this Court. All discovery that has been provided to date will be deemed to be part of discovery in any new action filed as a related case, and testimony and evidence introduced in the corrections phase of this case will be admissible on the merits in any new action brought by current counsel on corrections issues.

### C. Medical Care

The plaintiffs negotiated the medical care provisions of the proposed Settlement Agreement with three principles in mind: (1) an adequate number of medical staff should be provided; (2) the medical staff should provide medical care pursuant to generally accepted policies and procedures; and (3) there should be a system to monitor the implementation of the policies and procedures. Throughout the settlement negotiations, plaintiffs' counsel consulted with a seven-member medical expert team, led by Dr. Ronald Shansky. The team consisted of five physicians, a physician's assistant and a Ph. D.-level registered nurse.

### 1. Staffing

One of the major accomplishments of the settlement negotiations was the agreement reached on a minimum number of physicians, dentists, and registered nurses for each correctional institution. Because the current level of staffing does not meet the newly-defined minimum, the DOC has agreed to request funding for more than 150 new medical staff positions throughout the system. For every 1000 inmates at a facility the Agreement requires a minimum of forty hours per week of primary physician time and ten full-time registered nurses.[7] The

physician hours do not include services provided by medical specialists or time expended in performing reception physical examinations. Although the DOC may elect to substitute physician assistant hours for up to 30% of the physician hours, each physician assistant hour will be treated as the equivalent of only 0.4 physician hours. Consistent with existing DOC policy, there will now be 24-hour on-site registered nurse coverage at all facilities.

The agreement also provides for specific staffing levels for dentists, dental hygienists, and dental assistants. When a facility experiences a significant vacancy rate in a particular position, defendants have agreed to make arrangements for staff coverage through individual contracts or short-term employment. *See* Settlement Agreement ¶ 15.

### 2. Policies and Procedures

The Settlement Agreement provides for the adoption of a wide range of medical policies and procedures. Such provisions were based, in large part, on the premise that the DOC has proven its ability to promulgate effective medical policies and procedures by formulating and implementing an excellent TB policy in 1992 after institution of this lawsuit. To date, the 1992 TB Policy has been highly successful in preventing what might otherwise have been an outbreak of active TB. With that background, the parties agreed that by June 30, 1995, the DOC will develop policies regarding, among other aspects of health care, entrance screening, medical transfer procedures, on-site and off-site referral access to health care, infirmary admissions, health education and preventive care, emergency care, dental care, specific policies for the management of chronic diseases including HIV, diabetes, cardiovascular disease, hypertension, asthma and pulmonary disorders, medical records, follow-up for abnormal laboratory results, staff credentials and appropriate limitations on scope of practice, and the establishment of a Peer Review Committee.

---

7. The ratio of one registered nurse per 100 inmates is the same as that approved for SCI–Pittsburgh in *Tillery*, 719 F.Supp. at 1290 (approving staffing plan of eighteen registered nurses for population over 1800).

### 3. Equipment and Facilities

The DOC has agreed to request funding to provide standard medical equipment at each of its facilities. A prioritized list of equipment which will be made available at all state correctional institutions is included in the Settlement Agreement. *See* Settlement Agreement Attachment 3. The list, in order of priority, provides for call bell systems, an oxygen concentrator, a peak flowmeter, a word processor, a computer, a pulse oximeter, crash carts (without defibrillator), hospital beds, Hoyer lifts, two autoclaves (one for dental; one for medical), an addressograph and embossers, a locked medicine cabinet for drug delivery, geriatric chairs, shower chairs, an ultrasonic dental machine, gurneys, a paper shredder, two refrigerators, equipment for Restricted Housing Unit exam rooms and exam room areas and a motorized vehicle (such as a golf cart) for emergency use.

### 4. Quality Assurance

The Settlement Agreement provides that the DOC will adopt a comprehensive quality assurance program designed to ensure that the medical provisions of the Agreement are properly implemented. One of the most important components of this program is the DOC's establishment of a Peer Review Committee. This Committee, composed of physicians from outside the correctional system whose identity will not be made known to the DOC employees and contractors involved in health care, will provide oversight to the practice of medicine; review physicians' standards of practice with regard to DOC policy; and make recommendations to the Director, Bureau of Health Care Services and to the Commissioner of Corrections on the subject of physician credentialling and disciplinary actions. In addition, under the Agreement the Committee will review the new policies and procedures developed by the DOC for "consistency with contemporary standards of practice." *See* Settlement Agreement ¶¶ 18, 32–33. Because the members of the Peer Review Committee will remain anonymous, DOC physicians and nurses and others providing health care in the state correctional system will not be able to influence the Committee's recommendations in any way.

### 5. Monitoring

Defendants have agreed to provide plaintiffs' counsel with a substantial amount of information so as to enable them to monitor the DOC's compliance with the Settlement Agreement. In the area of medical care the Agreement provides that plaintiffs' counsel will receive a variety of reports and other documents on a quarterly basis: biweekly reports from the correctional health care administrators, the Regional Health Care Administrators' Quarterly Status Report, the executive monthly State Corrections Analysis Network ("SCAN") report relating to medical issues, the equipment lists for each facility reflecting the present state of equipment on site, the TB Summary of Tracking Data Report, the Inmate Deaths Database System Printout, the Facility Medical/Mental Health Staffing Report, an explanation for any vacant positions which are not filled within three months, institution population counts from the SCAN data, copies of promulgated policies, copies of the public DOC and Bureau of Health Care Budget and Rebudget documents, reports of the measurements taken in the negative air pressure rooms reflecting the number of air exchanges per hour, and reports from each facility regarding emergency equipment checks.

### D. Mental Health Care

In the area of mental health care, the Settlement Agreement is intended to provide substantive improvements in the availability and types of services for inmates and to increase quality control over mental health treatment decisions. To achieve this goal, the DOC has agreed not only to increase the number of beds available for on-site, therapeutic treatment but also to establish specific treatment standards which will be reviewed by an independent peer review committee. Plaintiffs' counsel will have the right to monitor the DOC's performance to ensure compliance with the mental health provisions of the Settlement Agreement.

Inmates in need of mental health care are currently assigned to Special Needs Units ("SNUs") and Mental Health Units

("MHUs").[8] These units are intended to provide on-site therapeutic bed space for inmates who are seriously mentally ill or who require short term commitment to a forensic facility. Placement in either unit requires the development of a treatment plan with specific criteria to address an inmate's particular mental health problem. Inmate access to the SNU is governed by DOC policy; MHUs are licensed and admission to such units is governed by state law. *See* 55 Pa. Code § 5200.31 *et seq.*

The DOC has agreed nearly to double the number of beds in SNUs from 450 to 800 and not to reduce the number of SNU beds unless the correctional institution population decreases. This expansion will alleviate the problem of placing inmates in Restricted Housing Units where treatment and other programs are far less accessible. Inmates placed on psychotropic medications will be evaluated at least once every six months for signs of tardive dyskinesia and, if such signs are detected, the inmate will receive necessary medical treatment. Individuals who refuse to take prescribed psychotropic medications will not be placed in administrative custody solely on the basis of a mental health diagnosis and refusal to be medicated with psychotropic drugs. The Agreement will also strengthen the programming provided to inmates in SNUs.

In addition to increasing the availability and types of mental health services to inmates, the Settlement Agreement establishes better quality control over mental health care. The Agreement requires the DOC to adopt and implement policies to assure appropriate mental health care to inmates through individualized treatment plans and specialized unit treatment requirements. The DOC has also agreed to continue using a tracking system to assist in determining treatment needs, both individually and systemically.

The DOC will create a new position titled "Chief of Psychiatric Services." The person in this position will have the authority and responsibility to oversee all aspects of psychiatric care and will, together with the Chief of Psychological Services, coordinate all mental health care in the state correctional system. The DOC will also establish a Peer Review Committee for quality assurance in mental health care analogous to that utilized by major hospitals.

In order to facilitate monitoring of defendants' compliance in the mental health area by plaintiffs' counsel, the DOC has agreed to provide counsel with quarterly status reports regarding implementation of the mental health provisions of the Settlement Agreement. Copies of all policy changes and new policies implemented during the course of monitoring will be included in these reports. Plaintiffs' expert, Dr. Jeffrey Metzner, will be allowed to tour specific areas in a number of correctional institutions after June 30, 1995. During these tours Dr. Metzner will be permitted to interview mental health personnel and review inmates' case files after appropriate releases are obtained.

### E. Corrections

The provisions of the Settlement Agreement in the corrections area cover several discrete issues—access to the courts, excessive force claims against corrections officers, jobs and educational opportunities and sex offender programs. Plaintiffs' counsel made significant advances in three of the four areas. The DOC is required to hire outside paralegals to aid inmates who, because of lack of education or their placement in a heightened security unit, have difficulty in preparing legal filings. The DOC is required to expand the functions of the office which investigates excessive force claims by inmates. And the DOC is required to increase the most desirable inmate jobs by over 50%. In the final area, sex offender programs, plaintiffs' counsel have concluded that complete relief cannot be afforded because the Pennsylvania Board of Probation and Parole is not a party to this action. Accordingly, counsel intend to file a separate action in

---

8. SNUs are located at SCI–Camp Hill, SCI–Cresson, SCI–Dallas, SCI–Graterford, SCI–Greensburg, SCI–Huntingdon, SCI–Rockview and SCI–Smithfield. The State Regional Correctional Facility at Mercer has a separate block for special needs inmates. MHUs are located at SCI–Cresson, SCI–Frackville and SCI–Graterford.

which the DOC and the Pennsylvania Board of Probation and Parole are named defendants.

### 1. Access to the Courts

The Settlement Agreement provides that the DOC will hire paralegals (1) to provide legal assistance directly to inmates and (2) to train inmate legal reference aides who will then be permitted to assist inmates in the general population with legal matters. In allocating the paralegals' time, priority will be given to non-English speaking inmates and those inmates who cannot read at the 8th grade level. The DOC has agreed to allow private conferences between inmates and paralegals and, when necessary, to provide translation services through a non-employee translator. Conferences between inmates and inmate legal reference aides will be afforded privacy by the DOC when consistent with institutional space availability and security requirements.

The DOC has agreed to create mini-law libraries in Restricted Housing Units. In addition, on-site photocopy services will be provided at each institution at reasonable charges.

Plaintiffs' counsel considered those to be important improvements but they also concluded that a number of related provisions would, in all probability, be insufficient to provide the requisite level of services. In response, the DOC has agreed to consider suggestions from plaintiffs' counsel once the new program is in operation and data regarding access to law libraries and the courts is available. If the legal assistance provisions of the Settlement Agreement do not prove to be adequate, plaintiffs' counsel have advised the Court they will reinstitute suit on this issue. Furthermore, the same issue is currently before the Honorable Maurice B. Cohill, Jr., in the *Tillery* case, a class action involving inmates at SCI–Pittsburgh. A ruling in *Tillery* on the sufficiency of the DOC system for access to the courts is expected within the next several months.

### 2. Excessive Force Claims

The Settlement Agreement provides that allegations of excessive force by corrections officers will be tracked and monitored by the Special Investigations Office. That Office, located in Camp Hill, is charged with the responsibility for investigating and disciplining corrections officers who physically abuse inmates. Although it is part of the DOC, the Special Investigations Office is independent of the correctional institutions which it investigates. Under the Agreement the Special Investigations Office has authority to review the investigation in any case, order additional investigative steps or procedures or assume direct responsibility for the investigation.

Because it may be difficult in some situations for an inmate to identify a corrections officer by name, the DOC has agreed to maintain photographs of all employees to aid inmates seeking to identify an alleged assailant. The DOC will also purchase fixed cameras for, or assign dedicated camcorders to, each Restricted Housing Unit to record incidents in which force is used against inmates.

### 3. Jobs and Educational Opportunities

The Settlement Agreement provides for the creation of 725 additional Correctional Industries jobs by December 31, 1995. *See* Settlement Agreement ¶ 148. Correctional Industries jobs are primarily skilled manufacturing and service positions which pay the highest rate on the DOC pay scale. Inmates employed in the manufacturing jobs produce such items as modular and upholstered furniture, mattresses, dental prosthetics and a variety of formed metal objects. Inmates working in the service area perform data processing. In addition to these Correctional Industries positions, the DOC will offer some type of non-Correctional Industries work to eligible inmates within six months of arrival at their parent correctional institution. *See id.* ¶ 149.

With respect to educational programs, the DOC agreed to maintain Graduate Equivalency Degree programs and will assign inmates to these programs in such a way that the time between application and initial class will not exceed 120 days. *See id.* ¶ 150. Moreover, the DOC will advocate and encourage the availability of Graduate Equiva-

lency Degree and other educational programs.[9] *See id.* ¶ 151.

### 4. Sex Offender Programs

Plaintiffs' objections to the sex offender programs are based on the fact that, for the most part, the Pennsylvania Board of Probation and Parole requires successful completion of a program in which an inmate admits guilt as a prerequisite for parole. A number of inmates have objected to the requirement that they admit guilt on the ground that this system violates their Fifth Amendment rights if they have ongoing criminal proceedings.

The Board of Probation and Parole is a necessary party to any complete adjudication of the issues raised by plaintiffs with respect to the sex offender programs. Accordingly, that issue will be addressed in a separate lawsuit in which the Board of Probation and Parole and the DOC are named defendants.

### 5. Monitoring

The monitoring provisions associated with the corrections aspects of the case require the DOC to supply plaintiffs' counsel with the following information on a quarterly basis: the number of paralegal positions system-wide and whether those positions are filled or vacant, the number of hours actually worked by the paralegals, the response time for paralegal requests, the number of requests for legal assistance at each institution from inmates in restricted housing, requests that were declined by the paralegals because they were frivolous, the number of legal reference aides and requests filled by the legal reference aides, copies of all regulations, rules and directives pertaining to corrections, the number of inmates enrolled in Correctional Industries, vocational training, other work assignments, Graduate Equivalency Degree programs and other educational programs, the number of cases actually investigated by the Special Investigations Office, the method of disposition of these cases and the number of cases in which additional investigation was ordered, all investigative records regarding allegations of abuse of force received by the Special Investigations Office, access to tracking data on inmate abuse allegations, information concerning placement of inmates in protective custody, the names of inmates placed in administrative custody or transferred to another institution for the inmates' protection, access to videotapes of force used by corrections officers against inmates, and the names of the institutions which offer a non-admitter sex offender program. The Court concludes that such documents and other information will provide plaintiffs' counsel with the means to monitor defendants' compliance with the corrections provisions of the Agreement.

### F. HIV/AIDS

In the area of HIV/AIDS plaintiffs' counsel had two main concerns—eliminate or, at least, minimize unlawful discrimination against HIV-infected individuals and increase the protection currently afforded to information regarding inmates' HIV status. From the point of view of the plaintiff class, the parties agreed to substantial improvements on both issues.

The DOC has agreed that, as a general rule, HIV-infected individuals will be precluded from a work assignment only if the individual poses a direct medical threat to the health of others. Although negative reactions of DOC employees or other inmates generally will not be a sufficient ground to justify restrictions on the employment of HIV-positive individuals, on occasion, the DOC may reassign or transfer an HIV-positive individual for security reasons.

The DOC has agreed to keep inmates' medical information regarding HIV status confidential and to advocate a universal precautions policy in place of the current Contagious Disease Notification Policy in its forthcoming negotiations with the union representative of its custody staff. Under a policy of universal precautions, all blood and body fluids are presumed to be potentially conta-

---

9. Under Pennsylvania law, eligibility for and availability of educational programs is controlled by the Pennsylvania Department of Education. Educational services are provided in a coopera-tive manner by the DOC and the Pennsylvania Department of Education. *See* Settlement Agreement ¶ 151.

gious. *See* Plaintiffs' Motion for Partial Summary Judgment on HIV/AIDS Privacy and Discrimination, Affidavit of Albert J. Raymond, M.D. at 22. The DOC will also take the position in its forthcoming labor negotiations that inmates who have a history of serious violent behavior will be placed on a notification list for the safety of corrections officers. Serious violent behavior is defined as actual or threatened violent or assaultive behavior such as assaults, biting, scratching, or the use of blood or excrement as a weapon or means of intimidation. Finally, the DOC has agreed to enhance and update the current educational materials on HIV/AIDS and establish a review panel to oversee the educational process.

With regard to the monitoring of HIV/AIDS provisions, the DOC has agreed to provide plaintiffs' counsel with the names of HIV-positive inmates (provided the appropriate waivers are obtained) and the type of jobs they hold, any policy changes or new policies that would impact on the HIV-infected inmates' employment or would be otherwise relevant to HIV, any grievance arising from a denial of employment based on HIV status or disclosure of HIV information, a summary of disciplinary procedures against employees for a breach of confidentiality of an inmate's HIV status, contagious disease notification lists, and documentation supporting the finding that an inmate has a history of serious violent behavior. Such information will enable plaintiffs' counsel to monitor compliance in this area of the settlement.

### G. Environmental/Fire Safety

The parties have agreed to a wide range of provisions regarding the maintenance of environmental and fire safety standards. These provisions include, among others, a requirement for the sanitization of mattresses, vermin control, adequate lighting and ventilation, appropriate food temperatures, regular inspections of water quality, proper use of extension cords and issuance of noncombustible wastebaskets. The DOC has agreed to use only those inmates who have been appropriately trained and certified for the asbestos abatement projects which are ongoing at several correctional institutions.

With regard to the handling of material containing asbestos, the DOC has a policy, which is currently being revised, establishing safety standards. In addition to these general environmental provisions, the Settlement Agreement includes provisions which require the DOC to remedy specific problems at the original thirteen institutions involved in the suit.

In the environmental/fire safety area, the DOC is negotiating a memorandum of understanding with the Department of Environmental Resources to provide independent oversight of the DOC's compliance with respect to certain environmental provisions of the Agreement. Plaintiffs' counsel will also have the right to monitor the DOC's compliance and, to that end, will be provided with various reports and surveys. Such documents and other information will enable plaintiffs' counsel to monitor compliance in this area of the settlement.

### H. Attorneys' Fees

The parties have agreed that plaintiffs' attorneys will receive $1.4 million in counsel fees and costs. This payment includes any claims for fees and costs that plaintiffs could make under 42 U.S.C. § 1988 or any other federal statute or rule of procedure for all work done and costs expended in the litigation of this matter to date.

## III. DISCUSSION

■ Unlike the typical two-party suit, a class action is a procedural device which allows a group of individuals with common interests to join together to pursue their collective claims through representatives. One commentator has stated that the dual mission of the class action is "to reduce the units of litigation by bringing under one umbrella what might otherwise be many separate but duplicating actions [and], even at the expense of increasing litigation, to provide means of vindicating the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." Benjamin Kaplan, *A Prefatory Note*, 10 B.C.Indus. & Commercial L.Rev. 497, 497 (1969).

█ In traditional, two-party litigation there is a general policy in favor of encouraging settlements because such a resolution conserves judicial resources and minimizes litigation expenses. *See Williams v. First National Bank,* 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910) ("Compromises of disputed claims are favored by the courts."); *Sherin v. Gould,* 679 F.Supp. 473, 474 (E.D.Pa.1987) (same). While the same considerations apply in the class action context, the extraordinary amount of judicial and private resources consumed by massive class action litigation elevates the general policy of encouraging settlements to "an overriding public interest." *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977); *see also Armstrong v. Board of School Directors,* 616 F.2d 305, 313 (7th Cir.1980) ("Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.").

█ Because of their representative nature, however, settlements of class actions are particularly susceptible to abuse by the named plaintiffs or their attorneys. Class representatives and their attorneys, entrusted with the responsibility and ability to settle claims on behalf of all class members, may be tempted to settle a case at more favorable terms for themselves, to the detriment of absent class members. To guard against such improper conduct, it has long been the rule that "a class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.P. 23(e).

## A. Notice to Class Members

Although Rule 23(e) states without exception that "notice of the proposed dismissal or compromise shall be given," courts have consistently held that notice to class members is required only when consistent with the rule's purpose—the protection of absent class members. As an example, involuntary dismissals have been judicially exempted from the purview of the notice requirements of Rule 23(e) because there is no possibility that the named plaintiffs or their counsel could "sell out" the class for their own benefit. *See* 7B Charles A. Wright et al., Federal Practice and Procedure § 1797, at 345 (1986) ("Wright") ("Another exception to the mandatory notice requirement in Rule 23(e) occurs when the dismissal is not voluntary."); *but see Papilsky v. Berndt,* 466 F.2d 251, 257 (2d Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 689, 34 L.Ed.2d 665 (1972) (stating that when plaintiffs consent to summary judgment being entered against them, purpose of rule is implicated and notice is required).

When the dismissal or settlement of a class action is without prejudice and will not prevent any class member from bringing a subsequent action, courts have held that the notice provision of Rule 23(e) is inapplicable. *See Sheinberg v. Fluor Corp.,* 91 F.R.D. 74, 75 (S.D.N.Y.1981) ("[N]one of the reasons which underlie the notice requirements of Fed.R.Civ.P. 23 and 23.1 with respect to voluntary discontinuances are operative here; no one's rights are being cut off and no potential abuses are present."); 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 11.66 (1992) ("Newberg") (stating that notice is not mandatory in all instances because the language of Rule 23(e) is sufficiently flexible to permit the court to determine that no class notice is required when the dismissal or compromise will not result in any prejudice to class members).

█ The proposed dismissal in this case is without prejudice and, if approved, none of the class members will be precluded from bringing a subsequent suit for monetary or injunctive relief. Therefore, notice to class members is not required by Rule 23(e). However, because this Court concluded that the class members' views would be useful in determining whether to approve the settlement, it directed that notice be provided.

█ On three separate occasions the DOC posted notices regarding the Settlement Agreement in the common areas of all institutions housing class members. The DOC posted a "Notice of Proposed Settlement Agreement" on or about August 9, 1994, a "Notice Regarding Objections to the Pro-

posed Settlement" on or about September 20, 1994, and a "Notice of Hearing" on or about November 29, 1994. *See generally* Documents Evidencing Compliance with Federal Rule of Civil Procedure 23(e) Notice Provisions ("Notice Compliance Documents") (providing declarations by administrators at each institution stating the time and place notices were posted and the names of inmates who reviewed Settlement Agreement). These notices informed the class members of the prospective settlement and the location of copies of the Settlement Agreement and the way in which to file objections with the Court. Because of the extensive notice provided in this case, the Court concludes that any applicable notice requirements of Rule 23(e) have been satisfied.

## B. Court Approval

Recognizing that the court approval provision of Rule 23(e) was designed to protect class members from the potential for abuse . by class representatives and plaintiffs' counsel, courts evaluating Settlement Agreements have required plaintiffs' counsel to show that the agreement is "in the best interests of all those who will be affected by it," 7B Wright § 1797.1, at 378, and that "the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants." 2 Newberg § 11.46, at 11–105 to 11–106. Accordingly, in deciding whether to approve a Settlement Agreement, courts have held that the central question is whether the settlement is "fair, adequate, and reasonable." *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118 (3d Cir.1990); *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 965 (3d Cir.1983).

The cases which apply the "fair, reasonable and adequate" test are premised on the assumption that the absent class members will be bound by the terms of the Settlement Agreement and will be precluded from further litigation of their individual claims. The Supreme Court, in a discussion of the court approval requirement of Rule 23(e), alluded to this underlying assumption:

> The certification of a suit as a class action has important consequences for the unnamed members of the class. If the suit proceeds to judgment on the merits, it is contemplated that the decision will bind all persons who have been found at the time of certification to be members of the class. Once the suit is certified as a class action, it may not be settled or dismissed without the approval of the court.

*Sosna v. Iowa*, 419 U.S. 393, 399 n. 8, 95 S.Ct. 553, 557 n. 8, 42 L.Ed.2d 532 (1975) (citations omitted).

The settlement agreement in this case, unlike any reported decision cited by the parties or located by the Court, provides that the dismissal of this class action is without prejudice. Approval of the settlement and dismissal of the action without prejudice will not have an adverse effect on the rights of *any* of the class members. That is so because any class member will be able to file an individual claim or, if appropriate, a representative claim on the issues covered by the settlement after such a dismissal.

 With the case in its present posture, some courts might not deem it necessary to rule on the fairness of a proposed class action settlement because the class members' rights will not be adversely affected and the primary purpose of Federal Rule of Civil Procedure 23(e), the protection of absent class members, is not directly applicable. This Court believes that such an approach would be imprudent. First, the plain language of Rule 23(e) requires court approval of all dismissals or compromises of class actions. Even Federal Rule of Civil Procedure 41(a) excepts class actions from those cases which may be dismissed by a plaintiff without a court order. Second, allowing a class representative to dismiss an action without court approval if the dismissal is without prejudice would prevent the court from overseeing such class actions and create the potential for abuse by class representatives who bring meritless class actions for their settlement value. Even though the potential for abuse is not as great as when the dismissal is with prejudice because the class representatives cannot settle at the expense of the absent class members, the added leverage that a class representative has by virtue of class certification could lead to settlements without prejudice that unfairly com-

pensate class representatives and counsel. Finally, by moving for class certification pursuant to Federal Rule of Civil Procedure 23(c), the class representative has voluntarily taken on a court imposed, fiduciary responsibility. *See Zimmer Paper Products, Inc. v. Berger & Montaque, P.C.,* 758 F.2d 86, 95 (3d Cir.1985) (Weis, J., dissenting) ("The fiduciary obligation of class counsel may go beyond the notice requirements of Rule 23(e)."), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985). This obligation may not simply be abandoned at will but can only be relinquished with court approval. For all such reasons, this Court concludes that Court approval of the Settlement Agreement is required even though the Agreement provides for a dismissal without prejudice. Accordingly, the Court will determine whether the provisions of the Agreement are "fair, reasonable and adequate" to members of the plaintiff class.

▬▬ The proposed settlement in this case is, on balance, beneficial to all class members. It eliminates or improves a number of the conditions and practices challenged by the class on constitutional grounds. Nevertheless, because the settlement represents a negotiated resolution of disputed issues, from the point-of-view of the class members it does not provide all the relief sought by members of the class. That conclusion, however, standing alone, does not require rejection of the settlement. Rather, for the reasons set forth below, the Court concludes that the settlement advances the interests of the class, and is most certainly "fair, reasonable and adequate."

▬▬ In determining whether a class action settlement is "fair, reasonable and adequate," the Third Circuit has enunciated a number of factors for consideration: (1) the complexity, expense and likely duration of

the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the ability of the defendants to withstand a greater judgment; and (6) the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation. *See Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975). In addition to the *Girsh* factors, several courts have accorded significant weight to the view of experienced counsel who have engaged in arm's-length negotiations. *See In re Unisys Corp. Retiree Medical Benefits ERISA Litig.,* MDL No. 969, 1994 U.S.Dist. LEXIS 17877, 1994 WL 702638 (E.D.Pa. November 3, 1994). Taking all of those factors into consideration, the Court concludes that the settlement in this case is "fair, reasonable and adequate," for the reasons which follow:

### 1. Complexity, Expense and Likely Duration

▬▬ There can be little doubt that this class action presents extremely complex issues for resolution and would be expensive and time consuming to try to conclusion. Plaintiffs have asserted § 1983 claims based upon the First, Fourth, Sixth, Eighth, Ninth and Fourteenth Amendments as well claims of discrimination on the basis of handicapped status in violation of Section 504 of the Rehabilitation Act on behalf of more than 24,000 inmates in 20 state correctional institutions.[10] The case was initiated more than four years ago and has already consumed a considerable amount of private and public resources.

Having already conducted nearly five weeks of trial on the corrections phase of this case, the parties estimated, and the Court agreed, that an additional 16 to 22 weeks would be required to complete all trial phases. *See* Order, October 13, 1993. Plaintiffs'

---

10. At the commencement of the suit, the plaintiff class consisted of approximately 18,000 inmates in thirteen state correctional institutions. On November 18, 1994, the Settlement Agreement was revised to state that all provisions concerning systemwide DOC policy, practice or procedure would apply to any other institution opened since the filing of the complaint and any institution that will be opened during the monitoring phase of the Agreement. *See* Settlement Agreement ¶ 231(g); *Glover v. Johnson,* 855 F.2d 277, 281 (6th Cir.1988) (class definition at time of certification consisting of all female felons at [both existing Michigan prisons] was held applicable to prison built after certification given the court's purpose in certifying the class and facts at time of certification). Taking these seven new institutions into account, the plaintiff class now consists of more than 24,000 inmates in 20 state correctional institutions.

counsel estimated that they spent approximately 500 attorney hours in connection with the TB injunction hearing and trial of the corrections phase of the case. An additional 16 to 22 weeks of trial would increase this figure manyfold. In light of the extraordinary expense required to try this complex case to completion, the Court finds that this factor favors approval of the Settlement Agreement.

## 2. Reaction of the Class

 Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider. *See TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 462–63 (2d Cir.1982). The Court should evaluate both the nature and number of objections. However, the mere fact that there is opposition, even from class representatives, does not necessitate rejection of the settlement. *See Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir.1983) (approving settlement over objections of more than 600 of 1,469 class members and 23 of 27 named plaintiffs). While there is authority to approve Settlement Agreements over the objection of a substantial number of class members, courts have held that there is a point when the objections are so numerous that disapproval is warranted. *Compare Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir.) (approving settlement over objections from 20% of class), *cert. denied, Abate v. Pittsburgh Plate Glass Co.*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), *with Wyatt v. Horsley*, 793 F.Supp. 1053 (M.D.Ala.1991) (stating that proportion of class that objects to proposed settlement may at some point become so large that settlement presumably is not in the best interest of class).

In July, 1994, the parties reached a settlement. The Settlement Agreement was submitted to the Court on July 29, 1994, and on or about August 9, 1994, copies of the Settlement Agreement and a Notice of Proposed Settlement were posted in all state correctional institutions which housed class members. The Notice of Proposed Settlement stated that objections must be mailed to the Court within 30 days.

Class members began filing objections to the Settlement Agreement on August 15, 1994. By Order dated September 20, 1994, the Court extended the time for filing objections to September 30, 1994. In the same Order, defendants were directed to post a notice in all state correctional institutions advising class members of the new cut-off date for filing objections, and that was done. *See* Notice Compliance Documents. By September 30, 1994, 385 objections had been received by the Court.

The Court, by Order dated November 21, 1994, stated that it would consider untimely objections and scheduled a hearing on the proposed settlement for December 12 and 13, 1994.[11] Plaintiffs' counsel chose 27 inmates from 18 institutions to represent the objectors at the hearing. The inmates were chosen because of the broad based nature of their filed objections.

By Order dated November 29, 1994, the Court directed the DOC to post a notice of the hearing on the proposed settlement at all correctional institutions except Muncy, Pittsburgh, and Quehanna. Such notices were posted. *See id.* The notice, which was approved by the Court, listed the representative inmates from each institution who were scheduled to testify and informed all other inmates that additional concerns could be transmitted to the representative inmates for presentation at the hearing. The notice also provided that an inmate who could not communicate with a representative inmate could present additional concerns to the Court by writing a letter to plaintiffs' counsel and giving it to the institution grievance coordinator on or before December 8, 1994 for delivery by the grievance coordinator to class counsel via overnight mail.

At the hearing on December 12 and 13, 1994, the Court received testimony from 24 representative inmates from 15 state correctional institutions. Several inmates expounded on the previous written objections they

---

11. In deciding the issues related to the settlement, the Court considered *all* objections filed or mailed by inmates and received by the Court prior to January 5, 1995.

submitted to the Court; others raised new concerns both on their own behalf and on behalf of others. In addition to such testimony, the Court stated it would consider all written objections to the Settlement Agreement regardless of when filed. By January 5, 1995, the Court had received 457 written objections, representing approximately 1.9% of the class members.

An analysis of the objections received by the Court follows:

### a. Medical Care [12]

#### (1) Peer Review Committee

A significant number of inmates claim that the Peer Review Committee will be ineffective because it will be comprised solely of doctors employed by the DOC. Those statements are incorrect. The Settlement Agreement provides for a Peer Review Committee which will be comprised of non-DOC physicians whose identity will not be revealed to the treating physicians and other health care providers at correctional institutions. *See* Defendants' Memorandum of Law in Support of the Proposed Settlement Agreement at Exhibit B, Declaration of Diane Marks ¶ 14 ("Marks Declaration"). Under the Settlement Agreement the Committee will evaluate physician and nursing practices in accordance with established guidelines and will review cases on a regular basis to determine the quality of care. Because the members of the Peer Review Committee will remain anonymous, DOC physicians and nurses will not be able to influence the Committee's recommendations in any way.

#### (2) Adequacy of Care

Objections in this category range from specific complaints that nurses are unfamiliar with basic life support techniques, *see* Letter 58, to general complaints requesting improvement of medical care, *see* Letters 128, 238, 453, to statements that medical personnel are unskilled or negligent. *See* Letters 74, 101, 119, 452. The Court finds the Settle-

ment Agreement addresses the adequacy of medical care issues by providing for the establishment of medical policies and procedures and comprehensive, system-wide quality assurance.

According to the Settlement Agreement, on or before June 30, 1995, the DOC will adopt new policies and procedures regarding entrance screening and medical clearance for transfer, access to health care, including sick call and on-site and off-site specialty referrals, infirmary admission procedures, health education and preventive care, access to emergency care, access to dental care, management of chronic diseases, maintenance of medical records, follow-up testing, staff credentials and continuing education. *See* Settlement Agreement ¶¶ 20–29.

On September 4, 1992, the DOC adopted and implemented a TB policy which ultimately proved to be highly successful in preventing what might otherwise have been an outbreak of active TB in state correctional institutions. In light of this experience the Court concludes that the DOC has demonstrated its ability to promulgate and administer effective medical policies and procedures. These new policies and procedures combined with oversight by the Peer Review Committee should result in marked improvement in health care. However, if plaintiffs' counsel, as a result of their monitoring, do not believe sufficient progress has been made, they are permitted to reinstitute this action. Furthermore, class members who believe that the level of medical care is inadequate are permitted to bring individual actions.

#### (3) Emergency Procedures

Inmates have raised questions regarding the adequacy and timeliness of certain emergency procedures for medical and dental care. *See* Letters 332, 284, 281, 275, 216, 274. In addition to requiring emergency response times to be logged and tracked, the Settlement Agreement provides for emergen-

---

**12.** Several class members' objections to the Settlement Agreement were based on complaints about the medical care they received at a particular institution. Because the Second Amended Complaint seeks declaratory and injunctive relief, an individual inmate's objections regarding his own care are not directly relevant to the Court's inquiry into the fairness of the Settlement Agreement. However, defendants have agreed to address such individual concerns and certain other individual claims raised by class members and will provide plaintiffs' counsel with responses after investigating such claims.

cy response drills, critiques, and a review of emergency treatment in 10% of all cases presented to determine the appropriateness of the care. *See* Settlement Agreement ¶ 36. The Court concludes the new DOC policies for access to emergency care will provide guidelines to track timeliness and adequacy of care and will enable the DOC to address the concerns expressed in this area of health care.

#### (4) Staffing

Some of the inmates challenge the Settlement Agreement on the ground that the proposed staffing level of health care professionals is insufficient. *See* Letters 63, 141, 255, 311, 338. A number of inmates identify what they believe is a particular shortfall in the number of dentists.

The Settlement Agreement requires a medical staffing level which is the result of several years of planning in conjunction with the opening of the DOC's prototypical institutions. This staffing provides for increases in the number of dentists, dental assistants and dental hygienists available system-wide and at particular institutions. Additionally, the level of physician, physician assistant and nursing coverage conforms to minimum standards established by the National Commission on Correctional Health Care. The Court concludes that the Settlement Agreement reflects a significant commitment to the improvement of the quality of medical care afforded to class members through an increase in the number of medical personnel.[13]

#### b. Mental Health Care

#### (1) Confidentiality

Some class members object to the Settlement Agreement because they believe that there are inadequate controls over mental health records to ensure confidentiality. The DOC has agreed to draft an informed consent form for inmates in connection with therapeutic and forensic interviews. This informed consent document will replace existing forms. *See* Settlement Agreement ¶ 53. In addition, the DOC has agreed to provide increased training to staff with access to

mental health records regarding the proper circumstances for disclosure.

By the very nature of its population, a corrections institution is occupied by a large number of individuals in need of psychological and psychiatric services. In order to assist these individuals in following a treatment plan for development of coping mechanisms during incarceration, licensed mental health staff must be able to maintain and share records addressing these issues. To accomplish this objective, the DOC has implemented a centralized mental health assessment and tracking system ("Mental Health Computer Tracking System") which begins when an inmate is first incarcerated in the Pennsylvania correctional system. The Mental Health Computer Tracking System, which has also drawn some criticism, contains extensive mental health data which allows for ongoing assessment of inmate needs. The Court concludes that the provisions of the Agreement with respect to confidentiality appropriately balance confidentiality and treatment concerns and are reasonable.

#### (2) Special Needs Units ("SNUs") and Mental Health Units ("MHUs")

Some class members contend that the number of SNU and MHU beds the DOC has agreed to maintain is insufficient because many of the allotted spaces will be taken by individuals who do not require therapeutic services. Given the extensive requirements for admission to a SNU or MHU, this Court finds little merit in the inmates' concern that such bed space will be used for non-therapeutic purposes.

Several inmates have objected to the DOC's practice of double celling inmates with mental health problems with general population inmates. They also object to the use of a psychiatric observation room ("POR") for inmates who decompensate before admission to a forensic facility is obtained. The Court concludes that the Settlement Agreement adequately addresses these concerns.

Inmates who are double celled are screened by mental health practitioners, and

---

**13.** The DOC's request for 78 new health care positions has already been approved pursuant to the Commonwealth's rebudget process. *See* Marks Declaration ¶ 4.

each placement must be documented in the inmate's mental health record. *See* Settlement Agreement ¶ 74. Placement in an institution's POR must also be documented and under the Settlement Agreement it is more limited than in past practice. For example, POR placement must include a well documented entry stating that the inmate's behavior is so disruptive that the inmate is a danger to himself or to others. These limitations correspond to the DOC's overall policy of placing inmates with mental health problems in an environment which is consistent with an individualized treatment plan. Moreover, a Peer Review Committee will be established to conduct periodic reviews of the implementation of these policies and to ensure that physician performance regarding mental health care is uniform and conforms to clinical standards. *See* Settlement Agreement ¶¶ 73, 75, 76, 77, 80.

### c. Corrections

#### (1) Access to the Courts

A number of class members do not believe the paralegals can effectively render legal assistance to inmates because of their employment by the DOC. *See* Letters 31, 52, 56, 87, 102, 169, 194. Some class members are of the view that the paralegals will be reluctant to file civil rights actions against correctional officers and other DOC employees because they will be influenced by the DOC; others believe that confidential communications will be disclosed to correctional institution personnel. *See* Letter 153.

Plaintiffs' counsel has undertaken to monitor the work of the paralegals to determine the efficacy of the program. To that end, the Settlement Agreement provides that the plaintiffs will have access on a quarterly basis over the next three years to information concerning the response time of the paralegals to inmate requests and to detailed information concerning instances in which the paralegals decline assistance because they deem the request legally frivolous. *See* Settlement Agreement ¶ 176. With respect to confidentiality, the Settlement Agreement provides that inmates consulting with paralegals will be afforded privacy to confer and a non-employee translator if needed. *See* Settlement Agreement ¶ 127.

Another group of class members, obviously unmoved by the claimed "conflict" resulting from the paralegals' employment by the DOC, objects to the settlement because plaintiffs' attorneys have not secured enough paralegals. *See* Letter 173. In a similar vein, another inmate objects to the fact that only inmates who read at or below the 8th grade level will benefit from the assistance of the newly-hired paralegals. *See* Letter 213.

The creation of the new paralegal position is a strong feature of the Settlement Agreement. Although the criticisms that more paralegals should have been hired and that the paralegals should be authorized to assist inmates who can read above the 8th grade level are certainly well-taken, plaintiffs' counsel was constrained by what defendants would concede in negotiations. The DOC believes that the provisions for legal aid included in the Settlement Agreement are sufficient to allow complete access to the courts. It has, however, expressed its willingness to consider class counsel's suggestions in the future once the program has been established and additional data are available. *See* Plaintiffs' Memorandum of Law in Support of Settlement Agreement at Exhibit A. Plaintiffs' counsel has stated that if the paralegal program does not provide sufficient assistance and adequate access to the courts, they will reinstitute suit on this issue under the applicable provisions of the Settlement Agreement. *See id.* Furthermore, even though relatively few paralegals will be hired, inmate access will ultimately increase substantially as the paralegals train inmate legal reference aides who will, in turn, be able to draft pleadings and otherwise assist inmates without regard to an inmate's reading level.

Some class members object because the Settlement Agreement does not secure additional law books for the law libraries, *see* Letters 8, 189, or increase the hours of operation or physical space of the law libraries. *See* Letters 18, 112, 133. Other class members object because the Settlement Agreement fails to provide for free photocopying of legal documents or cover the issues of photo-

copying turn-around time or the handling of legal correspondence.

The books available at the law libraries and the handling of legal mail in four state correctional institutions involved in this suit are the subject of a consent decree in an unrelated case.[14] *See Imprisoned Citizens Union v. Shapp,* 451 F.Supp. 893 (E.D.Pa. 1978). That consent decree is not vitiated by the current Settlement Agreement, and any objections to the provisions of the consent decree or the DOC's compliance by class members in those institutions are more properly addressed in the context of that case. With respect to the adequacy of legal materials and the handling of legal mail at the other state correctional institutions, class members who object are permitted to file independent actions.

As for the capacity of law libraries and their hours of operation which are set forth in paragraph 132 of the Settlement Agreement, plaintiffs' counsel conceded that they have not been able to establish that members of the class have been denied access to the courts because of the lack of access to law libraries. *See* Plaintiffs' Memorandum of Law in Support of Proposed Settlement Agreement at 10.

With regard to photocopying legal material, the Settlement Agreement provides that each institution is required to have its own photocopy machine and to provide inmates with copies of documents at a "reasonable" fee. *See* Settlement Agreement ¶¶ 146, 147. This provision unequivocally benefits the inmates who previously had to wait up to a week for a response to photocopying requests because their institution had no photocopy machines and sent their documents to private companies for copying. As for the demand for free photocopies, it suffices to say that there is no case which requires the DOC to absorb this cost, and plaintiffs' attorneys were unsuccessful in obtaining this concession through negotiation.

A specific goal of the litigation was the expansion of legal assistance to inmates who need advice and assistance in addressing legal claims. Under the agreement the DOC will for the first time hire paralegals to train inmate legal reference aides and to assist inmates confined in the Restricted Housing Units, create mini-law libraries within each Restricted Housing Unit and ensure that each institution is able to photocopy inmates' legal material on-site at a reasonable charge. These concessions by the DOC are substantial and provide the class members with tangible benefits. Having considered all of the objections, the Court finds that there is nothing that calls into question the fairness of the settlement with respect to access to the courts.

### (2) Excessive Force Claims

The most common objection to the provisions regarding controls on the excessive use of force is that it permits the "fox to guard the henhouse." *See* Letters 2, 53, 62, 117, 127, 187. In support of this objection, inmates point out that it is difficult to identify corrections officers because they do not wear nametags and the DOC fails to maintain current photographs of the officers. *See* Letters 11, 13. If the name of the corrections officer is known, the inmates must file their grievances with a colleague of their alleged assailant who, in the inmates' view, cannot be trusted to forward the material to appropriate personnel. *See* Letters 24, 52. With respect to grievances that are properly processed, a number of inmates object on the ground that the matter becomes a swearing contest which they invariably lose, *see* Letters 53, 117, 133, because the outcome is determined by a biased hearing examiner. *See* Letters 24, 58, 196. The inmates also complain about the reliance on video equipment as an impartial recorder of conflicts because the equipment is subject to manipulation by DOC personnel. *See* Letter 82. Finally, there are objections to the fact that the DOC does not maintain a central registry of complaints concerning verbal abuse and/or harassment similar to the registry which is required under the Settlement Agreement for physical abuse. *See* Letters 31, 100.

---

14. The four institutions are SCI–Dallas, SCI–Graterford, SCI–Huntingdon and SCI–Rockview. Although two other institutions, SCI–Muncy and SCI–Pittsburgh, are subject to the consent decree in *I.C.U.,* they are not included in the class definition in this case.

The DOC has established a Special Investigations Office to investigate and adjudicate claims of excessive force. This office is located in Camp Hill and is completely independent from the administration of the individual correctional institutions. Given the uncertainty that this Court would take the unusual step of ordering an outside agency to investigate complaints of excessive force, plaintiffs' counsel understandably sought in negotiations to make the Special Investigations Office more effective and accountable.

Under the Settlement Agreement the DOC agreed to maintain a registry of all excessive force grievances through which it will be able to identify whether particular corrections officers are routinely the subject of such complaints. *See* Settlement Agreement ¶ 156. In addition, the DOC stated it has under consideration creation of a similar database regarding verbal abuse and harassment grievances. *See id.* Plaintiffs' counsel will be furnished with copies of essentially all of the records and the database of the Special Investigations Office on a quarterly basis in order to determine whether the DOC is aggressively seeking to deter excessive force by disciplining employees who are repeatedly the subject of such complaints. *See id.* ¶¶ 179–81.

In order to facilitate the identification of corrections officers who are alleged to have assaulted inmates, the Settlement Agreement provides that the DOC will re-photograph its employees every five years. *See id.* ¶ 162. As to the objection that corrections officers do not process grievances alleging excessive use of force, there is simply no evidence that this has occurred systemically.

The Settlement Agreement also attempts to address the objection that, at grievance proceedings, an inmate's word is not generally accepted if corrections officers tell a contrary story, by providing that "the fact that the complaint of an inmate is not corroborated by other persons or physical evidence does not preclude the fact-finder from taking action." *See id.* ¶ 163. Finally, in an effort to minimize the ability of DOC personnel to manipulate the record of a particular conflict

through the selective use of hand-held video-cameras, the Settlement Agreement provides for the installation of fixed cameras in Restricted Housing Units and Special Management Units. *See id.* ¶ 169.

Protection from unwarranted force is a critical issue for the inmates in any correctional institution. Plaintiffs' expert, Patrick McManus, testified that any remedies available for grievances arising out of excessive use of force will only be effective if the DOC internalizes the responsibility for preventing excessive force by its employees. *See* Transcript, December 13, 1994, at 10–14. The Special Investigations Office was created by the DOC for the purpose of investigating excessive force claims and is just such a measure. The provisions of the Settlement Agreement dealing with claims of excessive force appropriately balance improvements in the operation of the Special Investigations Office without stripping it of authority and are beneficial to the class.

### (3) Jobs and Educational Opportunities

The most common objection in this area is that the settlement secures only 725 new Correctional Industries positions. *See* Letters 2, 52, 115, 123. Others complain that it does not address the issue of whether the inmate jobs are made available in a racially discriminatory manner. *See* Letters 2, 117. Finally, a number of inmates serving life sentences object to the settlement's failure to address Congress' decision to eliminate inmates' eligibility to receive Pell grants, which had previously paid for certain inmates' higher education programs. *See* Letters 51, 53.

The 725 new Correctional Industries positions represent a 51% increase in the number currently available.[15] Because federal law prohibits the interstate sale of goods made by Correctional Industries, sales of such products are limited. *See* 18 U.S.C. § 1761. Given this constraint, creating new Correctional Industries positions is difficult. Indeed, plaintiffs' expert, Patrick McManus, was "very impressed" with the creation of the new Correctional Industries positions because "[t]hese are the most difficult jobs to

---

**15.** As of January 1994, there were approximately 1,447 inmates employed in Correctional Indus-

tries by the DOC. The 725 positions will be added to that number.

develop." *See* Transcript, December 13, 1993, at 8. Even though not all inmates can be afforded a Correctional Industries position, which, according to Mr. McManus, is the most desirable from the inmates' point of view, the Settlement Agreement provides that the DOC will offer some type of regular employment to each inmate within six months after the inmate arrives at his parent institution. *See* Settlement Agreement ¶ 149. That provision will increase the speed with which inmates are provided work opportunities.

It is correct that the Settlement Agreement does not address racial discrimination in job placement or Congressional termination of Pell grants for higher education of qualified inmates. Plaintiffs' counsel decided not to pursue the issue of discrimination in job placement because they were not able to establish that allegation. *See* Plaintiff's Memorandum of Law in Support of Proposed Settlement Agreement at 15. However, because the Settlement Agreement contemplates a dismissal without prejudice, inmates who believe racial discrimination exists are able to file individual cases. *See* Settlement Agreement ¶ 231(b). As for the objections based on the Congressional termination of Pell grants for incarcerated persons, this litigation is simply not the proper forum to address these concerns.

#### (4) Sex Offender Programs

The major complaint concerning the portion of the Settlement Agreement which covers the sex offender therapy programs results from its failure to alter defendants' requirement that an inmate admit guilt in order to gain access to such programs. *See* Letters 53, 72, 107. As a practical matter, in order to be considered for parole by the Board of Probation and Parole, a sex offender must successfully complete a sex offender program in which he admits guilt. Because a number of inmates have ongoing criminal proceedings which could be affected by their admission of guilt, they contend the DOC's policy violates the Fifth Amendment. Other inmates complain that even though the Settlement Agreement provides that every institution will have a "non-admitters" program,

they are housed at an institution that does not maintain such a program. *See* Letters 43, 139. Moreover, even with such non-admitters programs, it appears that, generally speaking, the Board of Probation and Parole requires completion of a program in which guilt is admitted before it will consider an inmate for parole.

Plaintiffs' counsel has determined that the inmates' Fifth Amendment claims implicated by the sex offender programs have merit. However, because the Pennsylvania Board of Probation and Parole is a necessary party to a proper adjudication of the requirements for sex-offender programs and the relationship of such programs to consideration for parole, plaintiffs' counsel have concluded that this suit is not an adequate forum for resolution of this issue. Instead, they plan to institute separate litigation on this issue, naming the DOC and the Pennsylvania Board of Probation and Parole as defendants. *See* Plaintiffs' Memorandum of Law in Support of Settlement Agreement at Exhibit A. As for the complaint that not all DOC institutions presently offer a non-admitters program, defendants have represented that they will hire the necessary personnel to create such programs in those institutions which do not have one. *See id.* at Exhibit B.

#### d. HIV/AIDS

#### (1) Discrimination

Several members of the class object to the provision of the Settlement Agreement which requires non-discriminatory employment of HIV-infected individuals in job categories such as food service and personal service and in industrial positions. The objectors claim that there is a strong possibility that HIV-infected workers in these job categories could accidentally cut themselves, thereby transmitting HIV to others. Unfortunately, given the misconceptions about HIV and AIDS that remain common in the inmate population and the public at large, these objections are not surprising. However, there is no medical justification for such concerns. Moreover, the position the objectors espouse is most likely contrary to law.[16]

---

**16.** Because a court deciding whether to approve

a settlement agreement "need only evaluate the

■ Section 504 of the Rehabilitation Act of 1973, as amended, prohibits programs receiving federal funds from discriminating against otherwise qualified handicapped individuals solely on the basis of those handicaps. Congress' authority to regulate discriminatory behavior through the Rehabilitation Act is based on its power to attach conditions to the funding it provides. Under the Act and its implementing regulations, the sanctions for discrimination and any other non-compliance may be imposed on the recipient of federal funding.

■ To prevail on a discrimination claim under Section 504, a plaintiff must make a *prima facie* showing of four elements: (1) that he is handicapped within the definition of the Act; (2) that he is "otherwise qualified" to participate in the program or activity in question; (3) that he is being excluded solely because of his handicap; and (4) that the program or activity receives federal funds.[17] *See Strathie v. Department of Transp.,* 716 F.2d 227, 230 (3d Cir.1983).

For purposes of the Rehabilitation Act Congress has defined a handicapped individual as "[a]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(7)(B). Courts and administrative agencies are virtually unanimous in holding that individuals with AIDS meet this definition and are protected by the antidiscrimination provisions of Section 504. *See, e.g., Martinez v. School Board,* 861 F.2d 1502 (11th Cir.1988); *Chalk v. United States District Court,* 840 F.2d 701 (9th Cir.1988). Several courts have also held that HIV-infected individuals qualify as "handicapped individuals" under the Rehabilitation Act even though they display no outward manifestations of disease because the HIV virus impairs multiple body systems, including the hemic, lymphatic and reproductive systems, and by its biological effects and the fear it inspires in others, clearly limits those infected in major life activities. *See Glanz v. Vernick,* 756 F.Supp. 632 (D.Mass.1991); *Leckelt v. Board of Comm'rs,* 714 F.Supp. 1377, 1385 n. 4 (E.D.La.1989), *aff'd,* 909 F.2d 820 (5th Cir.1990); *Harris v. Thigpen,* 941 F.2d 1495, 1522 (11th Cir.1991).

An analysis of whether HIV-infected individuals are "otherwise qualified" depends on whether it is unsafe for them to work in a particular job classification while infected. In *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Supreme Court interpreted the Rehabilitation Act as reflecting a special Congressional concern about the long history of fear and mistreatment of people with contagious diseases. The Act, the Court explained, was designed to replace reflexive reactions based on fear, prejudice and ignorance with reasoned and medically sound judgments. The Court held that a person is "otherwise qualified" and therefore within the protection of the Act unless there is a "significant risk" of transmission involved in the challenged activity which cannot be eliminated through reasonable accommodation. In determining whether there is a "significant risk," the Supreme Court set forth several factors to be considered: the nature of the risk (how the disease is transmitted), the duration of the risk (how long the carrier is infectious), the severity of the risk (what is the potential harm to third parties), and the probabilities the disease will be transmitted and will cause varying degrees of harm. *See id.* at 288, 107 S.Ct. at 1131. The Court stressed that this assessment of risk must be based on "[findings of] fact, based on reasonable medical judgments given the state of medical knowledge." [18] *Id.*

probable outcome of the litigation and is not required to weigh and decide each contention," see *Bryan* 494 F.2d at 801, this Court does not hold that the inmates' position is contrary to law but rather that it is most likely contrary to law.

17. The DOC admits that it is a program or activity receiving federal funds. *See* Def's Answer to Second Amended Complaint ¶ 18. Furthermore, the Rehabilitation Act applies with the same force and effect in corrections institutions as it does in other federally-funded programs. *See Bonner v. Lewis,* 857 F.2d 559, 562–63 (9th Cir. 1988).

18. The Supreme Court's approach in *Arline* was codified in the 1988 amendments to the Act. *See* 29 U.S.C. § 706(8)(C). The amendments changed the definition of "individual with handicaps" to exclude, *inter alia,* anyone who "has a

According to the Centers for Disease Control, there is no evidence that HIV is transmitted by workers in food service positions. *See* Centers for Disease Control, *Recommendations for Preventing Transmission of Infection with Human T–Lymphotropic Virus Type III/Lymphadenopathy–Associated Virus in the Workplace,* 34 Morbidity and Mortality Weekly Report 682, 693 (1985) ("All epidemiologic and laboratory evidence indicates that blood-borne and sexually transmitted infections are not transmitted during the preparation or serving of food or beverages, and no instances of HIV transmission have been documented in this setting."). Furthermore, although transmission of the HIV virus has been documented rarely in acupuncture, ear piercing and tattooing, no cases have been reported in which a client has become infected with HIV in other personal service settings. From this result, the Centers for Disease Control concludes that any risk of transmission by a personal service worker "must be extremely low." *See id.*

■ In light of the undisputed medical evidence that there is little or no risk of HIV transmission in food service and personal service positions, barring HIV-infected inmates from such positions would most likely violate the Rehabilitation Act.[19] Defendants' 1987 and 1991 AIDS Policies recognize this possibility and articulate a general prohibition against discrimination in the employment of HIV-infected individuals. *See* Plaintiffs' Motion for Partial Summary Judgment on HIV/AIDS Privacy and Discrimination at A–45 (1991 AIDS Policy); *Id.* at A–24 (1987 AIDS Policy). Both policies specifically provide that food service and personal service workers "need not be restricted from work unless they have evidence of other infections or illnesses (e.g., salmonella, giardiasis, shigellosis) for which any ... employee should also be restricted." *Id.* at A–57 to A–58

(1991 AIDS Policy); *Id.* at A–31 (1987 AIDS Policy).

To the extent that inmates are concerned about the effect of the Settlement Agreement on employment in food service positions of inmates with contagious diseases which constitute a direct threat to their health or safety, their fears are misplaced. There is no medical evidence that HIV infection is a contagious disease which creates a direct threat to the health or safety of other individuals and nothing in the Settlement Agreement permits the DOC to employ individuals with contagious diseases which are a direct threat to the health or safety of others in food service or personal service positions.

### (2) Privacy

■ One group of inmates objects to the Settlement Agreement because they believe the provisions which ensure the anonymity of HIV-infected inmates are too stringent. These inmates want the DOC to test all inmates and notify the general population of those inmates who are HIV-positive. Such a notification procedure is unrelated to any penological interest and would most likely violate state law, *see* 35 P.S. §§ 7601–12 (1992), and the Constitution of the United States.[20] *See Whalen v. Roe,* 429 U.S. 589, 599–602, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977); *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577 (3d Cir.1980); *Nolley v. County of Erie,* 776 F.Supp. 715, 731 (W.D.N.Y.1991); *Doe v. Barrington,* 729 F.Supp. 376, 384 (D.N.J.1990); *Doe v. Coughlin,* 697 F.Supp. 1234, 1237 (N.D.N.Y.1988); *Woods v. White,* 689 F.Supp. 874, 876 (W.D.Wis.1988), *aff'd without op.,* 899 F.2d 17 (7th Cir.1990).

On the other hand, a different group of inmates objects to the Settlement Agreement because the privacy provisions are not strong enough. To be sure, plaintiffs' counsel, like this group of objectors, would have preferred

---

currently contagious disease or infection and who, by virtue of such disease or infection, would constitute a direct threat to the health or safety of other individuals." *Id.* The "direct threat" analysis is identical to the *Arline* "significant risk" analysis and the "terms have come to be regarded as interchangeable." *Doe v. District of Columbia,* 796 F.Supp. 559, 567 & n. 11 (D.D.C.1992).

**19.** The Court need only decide that barring inmates infected with HIV from such positions is most likely contrary to law. *See supra* note 16.

**20.** The Court need only decide that the proposed notification procedure is most likely contrary to law. *See supra* note 16.

a total elimination of any notification policy. There were, however, weighty reasons for accepting the settlement on this issue that, on balance, make it fair.

■ First, there was no assurance that this Court would order an elimination of the notification provision. Although individuals have an interest in preventing disclosure of their HIV status which is protected by state law and the Constitution, inmates' rights must necessarily yield to a certain extent to legitimate penological interests. *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987) ("When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). The Supreme Court has announced several factors which are relevant to the determination of whether sufficient penological interests are present—whether there is a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it; whether there are alternative means of exercising the right that remain open to inmates; the impact that accommodation of the asserted constitutional right will have on corrections officers and other inmates and on the allocation of resources generally; and the absence of ready alternatives. Without deciding whether legitimate penological interests sufficient to overcome the inmates' privacy rights are present in this case, the Court concludes that the plaintiffs would have difficulty challenging a limited notification policy like the one agreed to by the DOC in the Settlement Agreement.

Second, an agreement to end notification that did not consider the views of unionized employees might have engendered considerable resentment and even resistance among DOC staff which could have frustrated the purpose of any such settlement. In the long run, the protection of privacy will be most improved by changing the culture of the state correctional institutions. The staff has to accept that no system can reliably inform them of every inmate's HIV status, and that the best protection against the remote risk of workplace transmission is to rely on universal precautions and assume that any body fluid is potentially contagious. The settlement, which contemplates a negotiated change in policy with unionized employees combined with enhanced HIV education, offers the best prospect for fundamentally altering privacy practices among the correctional staff. The Court concludes that the settlement provisions with respect to this issue are reasonable.

### (3) Miscellaneous Objections

One objector, noting the past practice of the DOC, called for a complete segregation of HIV-infected inmates. The DOC eliminated a system of segregating HIV-infected inmates before the filing of this lawsuit after being advised by the Department of Health and Human Services that the practice violated the Rehabilitation Act. *See* Plaintiffs' Memorandum of Law in Support of Settlement Agreement at Exhibit E (Letter dated September 19, 1989, from Paul F. Cushing, Regional Manager, Office for Civil Rights Region III, Department of Health and Human Services, to David S. Owens, Commissioner, Re: Charge Numbers 03892002, 03892003, 03892006, 03892013).

Another objector suggested that the Agreement should include better HIV education for inmates. The short answer to that objection is that the Agreement does provide for improved HIV education. According to the provisions of the Settlement Agreement, the DOC will ensure that every training session is conducted by educators qualified to address medical and correctional issues, training sessions will be limited to 50 inmates, as resources allow, and training materials will be updated. *See* Settlement Agreement ¶ 192. Furthermore, an HIV Educational Review Panel will be established to review educational materials and practices at reasonable intervals to ensure that training remains responsive to institutional policies, medical facts, social developments and the concerns of staff members. *See id.*

### e. Environmental/Fire Safety

There are two categories of objections regarding environmental and fire safety issues: disputes as to whether the defendants are adhering to certain provisions of the Settlement Agreement and contentions that the

Settlement Agreement should have addressed additional environmental aspects of the institutions. Illustrative of the issues raised by the former category of objections are inadequate water temperature, leaking pipes, inadequate ventilation, failure to sanitize mattresses, and the number of available shower heads. The latter category includes, among others, objections to non-smoking inmates being housed with inmates who smoke, the absence of guard rails or ladders on bunk beds, lack of wheelchair access to certain facilities, and excessive noise.

Because the specific complaints are so narrow and varied, the Court is unable to respond in this Memorandum in a comprehensive manner. However, the Court has reviewed all of the inmates' objections and is satisfied that the individual objections which implicate defendants' compliance with the Agreement are being addressed by the DOC and reviewed by plaintiffs' counsel. Because the Settlement Agreement provides for a dismissal without prejudice, the inmates who object because they believe plaintiffs' counsel did not adequately cover all environmental issues will not be precluded from bringing an independent action.

### f. Overcrowding

A number of inmates complain that the settlement does not address overcrowding and the resultant double-celling of inmates. *See* Letters 9, 21, 24, 35, 48, 59, 60, 96, 99, 109, 111, 115, 126, 143, 153, 165, 170, 175, 184, 204, 213, 214, 238, 247.

Pennsylvania's correctional institutions were overcrowded at the commencement of this litigation. According to plaintiffs' counsel, this overcrowding is the cause of many of the other ills alleged in the Second Amended Complaint. However, since the institution of this lawsuit the DOC has opened seven new correctional institutions and two more are in the planning stage. Within the next year it is anticipated that the population of the state correctional system will be very close to rated capacity. Thus, since the institution of this suit, and, at least in part, because of it, the DOC has addressed the problem of overcrowding and has done much to alleviate it. Under those circumstances plaintiffs' counsel concluded it would be difficult, if not impossi-

ble, to establish the requisite deliberate indifference to prevail on this issue.

The Settlement Agreement provides for monitoring by plaintiffs' counsel. If the inmate population increases substantially over the course of the next several years and the DOC fails to take corrective action, plaintiffs' counsel are permitted to seek further relief and have agreed to do so.

### g. Enforceability

Numerous inmates object to the fact that plaintiffs' counsel has agreed to settle this matter without securing a consent decree. *See* Letters 2, 10, 11, 19, 39, 53, 68, 73, 78, 81, 102, 103, 105, 106, 112, 118, 121, 150, 153, 159, 161, 165, 172, 174, 175, 178, 180, 182, 184, 188, 192, 194, 198, 204, 213, 238, 279, 282, 288. These inmates believe that without the enforcement mechanism which accompanies a consent decree the Settlement Agreement will be worth little or nothing.

Because the defendants were unwilling to enter into a consent decree or any form of agreement directly enforceable by the Court, plaintiffs' counsel have structured an agreement that provides the class members with substantial benefits and procedural protections that are adequate to deal with any potential breach. First, the provisions that improve conditions of confinement will be secured significantly faster than would have been the case had plaintiffs continued the trial. Second, under the terms of the Settlement Agreement plaintiffs' counsel will monitor compliance through receipt of documents and on-site inspection, *see* Settlement Agreement ¶¶ 38–39, 99–103, 174–85, 195–97, 220–21, 225–27, and are authorized to reinstitute this litigation if defendants fail to meet their obligations. *See id.* ¶ 231(c)–(e). As a result, the defendants have a clear incentive to achieve full compliance. Third, as the case is dismissed without prejudice, not only is counsel authorized to reinstitute litigation on any issue presented by the Second Amended Complaint, but any inmate may file a lawsuit for damages or injunctive relief on any such issue.

In addition to the procedural protections of the Settlement Agreement, the DOC has already demonstrated its good faith by imple-

menting certain provision of the Agreement relating to medical care. According to Diane Marks, Director for the Bureau of Health Care Services for the DOC, the DOC's request for 78 additional health care positions has been approved, *see* Settlement Agreement ¶ 10, each institution currently provides 24–hour on-site registered nurse coverage, *see id.* ¶ 14, and the DOC is in the process of developing the comprehensive policies and procedures specified in the Settlement Agreement. *See id.* ¶¶ 18–30. Funding has been approved for the acquisition of the medical equipment specified in the Settlement Agreement, *see id.* ¶ 31, and an interim quality assurance program has been implemented while development of the quality assurance program provided by the terms of the Settlement Agreement is underway. *See id.* ¶¶ 32–36. These steps were taken despite legislative criticism and the fact that the Agreement had not been approved by the Court. The Court concludes that such action demonstrates the DOC's commitment to comply with the terms of the Settlement Agreement.

### h. Attorneys' Fees

■ Several inmates object to the provision of the Settlement Agreement which specifies that plaintiffs' counsel will receive $1.4 million as payment of fees and costs. Although the attorneys' fees were included as part of the Settlement Agreement and were not the subject of a separate motion under 42 U.S.C. § 1988, the Court must still determine whether plaintiffs' counsel is entitled to attorneys' fees and whether the fees are reasonable. *See Foster v. Boise–Cascade, Inc.,* 420 F.Supp. 674 (S.D.Tex.1976), *aff'd,* 577 F.2d 335 (5th Cir.1978); *Jones v. Amalgamated Warbasse Houses, Inc.,* 721 F.2d 881 (2d Cir.1983), *cert. denied,* 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984).

■ In any action brought pursuant to 42 U.S.C. § 1983, the Court, in its discretion, may award the prevailing party a reasonable attorneys' fee. *See* 42 U.S.C. § 1988. In order to be considered a "prevailing party" the plaintiffs must show that they have achieved "some of the benefit

sought" and that the relief obtained was causally connected to the prosecution of the complaint. *Ashley v. Atlantic Richfield Co.,* 794 F.2d 128, 131 (3d Cir.1986). Plaintiffs need not obtain relief identical to the relief they specifically demanded, as long as the relief obtained is of the same general type. *See Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897 (3d Cir.1985). The Court finds that plaintiffs undoubtedly have achieved a large measure of the benefit they sought by instituting suit and are a "prevailing party" for purposes of § 1988.

■ The Supreme Court has announced that " '[t]he most useful starting point for determining the amount of a reasonable fee [pursuant to 42 U.S.C. § 1988] is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.' " *City of Riverside v. Rivera,* 477 U.S. 561, 568, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1986) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)). This figure, commonly referred to as the "lodestar," is presumed to be the reasonable fee contemplated by § 1988. Although the Supreme Court discussed other factors which might lead to an upward or downward adjustment, it stressed that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," and that "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940.

■ Plaintiffs' counsel expended a substantial amount of time and resources in this litigation and obtained excellent results.[21] Overall, plaintiffs' counsel—Alvin Bronstein, Elizabeth Alexander and David Fathi from the American Civil Liberties Union Foundation National Prison Project, Stefan Presser, Legal Director, Pennsylvania American Civil Liberties Foundation, David Rudovsky, private practitioner and Senior Fellow, University of Pennsylvania School of Law, Angus Love, Pennsylvania Institutional

---

**21.** The facts set forth in this part of the Memorandum and in Part III.B.7 dealing with recommendations of class counsel are based, in part, on Plaintiffs' Statement of Fees and Costs which has been docketed.

Law Project, Robert Meek, Disabilities Law Project, and Scott Burris, Professor of Law, Temple Law School—expended approximately 7,850 attorney hours and 3,020 paralegal hours on this litigation. The breakdown of time and expenses is as follows:

Attorneys

| | |
|---|---|
| National Prison Project | 2,900 hours |
| American Civil Liberties Foundation (PA) | 1,650 hours |
| David Rudovsky | 1,420 hours |
| Institutional Law Project | 1,050 hours |
| Disabilities Law Project | 450 hours |
| Scott Burris | 380 hours |
| **TOTAL ATTORNEY HOURS** | 7,850 hours |

Paralegals

| | |
|---|---|
| American Civil Liberties Foundation (PA) | 1,620 hours |
| National Prison Project | 650 hours |
| Institutional Law Project | 750 hours |
| **TOTAL PARALEGAL HOURS** | 3,020 hours |

The times allocated above were spent in connection with drafting pleadings, motions and memoranda of law, discovery, expert tours of facilities, correspondence, trial preparation and trial. Approximately 500 attorney hours were spent in court (TB injunction hearing and trial on corrections issues). The Court concludes that the above listed hours were reasonably expended on the litigation.

Current billing rates for the attorneys range from $200 per hour for Attorneys Burris, Meek, Fathi and Love, to $275 per hour for Attorney Presser, to $300 per hour for Attorneys Rudovsky and Alexander, to $350 per hour for Attorney Bronstein. Paralegal billing rates are $75 per hour. The Court finds that these rates correspond to prevailing market rates in the Philadelphia area and are reasonable.[22] *See Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (stating that "reasonable fees" in federal civil rights action are to be calculated according to prevailing market rates in relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel).

Multiplying these current billing rates by the hours expended by each attorney, the attorneys' lodestar is $2,145,750 and the paralegals' lodestar is $226,500. In addition, plaintiffs' counsel incurred out of pocket costs (not including copying, telephone and other office expenses) of $432,000 in payments to expert witnesses and $20,000 for travel and related costs.

Together, counsel fees and costs total $2,824,250. The fact that plaintiffs prevailed through settlement does not extinguish or limit their claim for attorneys' fees because " '[n]othing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff[s'] rights have been violated.' " *Ashley,* 794 F.2d at 132 (quoting *Maher v. Gagne,* 448 U.S. 122, 131, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980)). Under the circumstances of the case, applying all of the foregoing rules of law, the Court concludes that the $1.4 million attorneys' fee agreed upon by the parties, approximately 50% of the total lodestar amount, is extremely reasonable.

### 3. Stage of the Proceedings

At the time the parties began settlement discussions, discovery had been completed and the Court had conducted almost five weeks of trial on the first of four phases of the case. The parties estimated, and the Court concluded, that completion of the trial of the remaining phases of the case would take 16 to 22 weeks. The fact that discovery had been completed does not necessarily weigh against approving the Settlement Agreement. Although savings are greatest in cases where settlement is reached with little or no costly discovery, it appears to the Court that it was the discovery and the willingness of plaintiffs' counsel to proceed to trial that made settlement possible in this case. Looking forward, it is clear that

---

22. The Court takes judicial notice of prevailing market rates in the Philadelphia area based on its experience as a litigator for 30 years before appointment to the bench and its experience with § 1988 requests in previous cases. *See Wojtkowski v. Cade,* 725 F.2d 127, 131 (1st Cir.1984) ("The court was entitled to draw on its own

knowledge of attorneys' fees in the Springfield, Massachusetts area, where it regularly sits, in arriving at reasonable hourly rates for the lodestar calculation."); *Searcey v. Crim,* 692 F.Supp. 1363, 1364 (N.D.Ga.1988) (judicial notice taken of affidavits relating to fees that were filed in other actions in district).

substantial savings will be attained by settlement because, even without factoring in the effect of a possible appeal, more than four months of trial time will be avoided by a settlement. In light of the savings to the Court and to the parties in avoiding over four months of trial, the Court concludes that the stage of the proceedings favors approval of the Settlement Agreement.

### 4. Risks of Establishing Liability

██ Although the Court must weigh the relative strengths and weaknesses of each side to determine the risks of establishing liability, it should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981). As the Third Circuit has stated:

> [A district court] need only evaluate the probable outcome of the litigation and is not required to weigh and decide each contention; further, the probable result at trial must be balanced against the probable costs, in both time and money, of continued litigation.

*Bryan*, 494 F.2d at 801.

██ At the time this action was filed, the governing standard announced by the Supreme Court for establishing an Eighth Amendment violation based on conditions of confinement was whether the conditions, alone or in combination, constitute "unnecessary and wanton infliction of pain" and offend "the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Less than one year after this suit was instituted, however, the Supreme Court altered the applicable standard by noting that the *Rhodes* formulation only applied to the objective component of the Eighth Amendment. *See Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The Supreme Court held that, in addition to the *Rhodes* showing, an inmate challenging conditions of confinement must show that the responsible officials acted with "deliberate indifference." *See id.* This change in the law undoubtedly made plaintiffs' case substantially more difficult to prove. During the pendency of this case, the DOC was able to design, construct, and staff no fewer than seven institutions, with two more institutions in the planning stage. Furthermore, after institution of suit, the DOC adopted and implemented a TB policy which was described by plaintiffs' expert as an "excellent document." These affirmative efforts by the DOC certainly would have been strong evidence to rebut plaintiffs' charges of deliberate indifference.

In addition, during the pendency of this suit, Congress passed the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (1994). One of the provisions of this Act states that "[a] Federal court shall not hold prison or jail crowding unconstitutional under the eighth amendment except to the extent that an individual plaintiff inmate proves that the crowding causes the infliction of cruel and unusual punishment of that inmate." 18 U.S.C. § 3626(a)(1). Relief in a case which meets this standard is limited to removal of the conditions that are causing the cruel and unusual punishment of the plaintiff inmate. *See* 18 U.S.C. § 3626(a)(2). Although these provisions are not beyond constitutional challenge, this intervening change in the law creates additional problems for plaintiffs in establishing liability.

The Court concludes that, overall, plaintiffs faced formidable hurdles in establishing liability. Accordingly, this factor weighs in favor of approving the Settlement Agreement.

### 5. Defendants' Ability to Endure Greater Judgment

██ Because this case sought only declaratory and injunctive relief, the defendants' ability to withstand a greater judgment is at issue only with respect to the cost of complying with the settlement. Thus, the Court must consider whether defendants could have agreed to provide additional concessions in any of the substantive areas of the Settlement Agreement.

The Court concludes that parties were able to reach agreement only after extensive arm's-length negotiations on each of the terms of the Settlement Agreement. The

Settlement Agreement confers substantial benefits on the plaintiff class and reflects a substantial commitment by the DOC. On the present state of the record, the Court cannot, and need not, determine whether the DOC could have funded additional benefits. This factor, therefore, favors approval of the Settlement Agreement.

### 6. Range of Reasonableness of the Settlement Fund

In order to evaluate the fairness of a Settlement Agreement based on the range of reasonableness of the settlement fund, a court must compare the settlement fund offered by defendants to the possible range of judgments. Because this action sought only declaratory and injunctive relief, such an evaluation is impossible. This factor, therefore, is inapposite to the Court's decision whether to approve the settlement.

### 7. Recommendation of Class Counsel

In determining the fairness of a proposed settlement, the Court should attribute significant weight to the belief of experienced counsel that settlement is in the best interests of the class. *See Fisher Bros. v. Phelps Dodge Industries, Inc.,* 604 F.Supp. 446, 452 (E.D.Pa.1985). As one court has observed:

Notwithstanding the court's substantial involvement in the suit over the last five years, the parties' counsel are best able to weigh the relative strengths and weaknesses of their arguments. The court is not inclined to substitute its educated estimates of the complexity, expense, and likely duration of this litigation without a sound basis for concluding that the settlement is inadequate.

*In re Chicken Antitrust Litig.,* 560 F.Supp. 943, 962 (N.D.Ga.1979).

The particular weight attributed to the recommendation of counsel depends on several factors—length of involvement in the case, competence, experience in the particular type of litigation, and amount of discovery completed. *See* Newberg § 11.47. Usually, however, an evaluation of all the criteria leads courts to conclude that the recommendation of counsel is entitled to great weight following "arm's-length negotiations" by

counsel who have "the experience and ability ... necessary [for] effective representation of the class's interests." *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1982); *see also* Manual for Complex Litigation, Second § 30.41 ("[A] presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced capable counsel after meaningful discovery.").

The Court finds that plaintiffs' counsel are highly experienced litigators in prisoner rights actions. Indeed, it would be hard to imagine a team of plaintiffs' attorneys with more impressive credentials.

Alvin Bronstein has been a lawyer for 43 years and has been the Executive Director of the National Prison Project of the American Civil Liberties Union Foundation since 1972. He has written extensively on the subject of prison litigation and has been involved in many major prisoners' rights cases at the trial and appellate level during the past 23 years. Among the many cases in which he has appeared are: *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). He is considered a leading national and international expert in prison litigation. *See, e.g., Plyler v. Evatt,* 902 F.2d 273, 278 (4th Cir.1990).

David Rudovsky has been the plaintiffs' counsel for over 25 years in *Jackson v. Hendrick,* a class action challenging conditions in the Philadelphia County Prisons, and one of the first comprehensive conditions of confinement prison lawsuits. His has also litigated numerous individual § 1983 cases for inmates and has lectured on prisoners' rights. Together with Mr. Bronstein, he is co-author of *The Rights of Prisoners* and is the author of a leading treatise on civil rights litigation, *Police Misconduct: Law and Litigation* (1993).

Elizabeth Alexander graduated from law school in 1971. She is Associate Director for Litigation of the National Prison Project of the American Civil Liberties Union Foundation. She briefed and argued *Farmer v.*

*Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) and *Wilson v. Seiter,* 501 ·U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Some of her significant prison cases include *Casey v. Lewis,* 43 F.3d 1261 (9th Cir.1994); *Knop v. Johnson,* 977 F.2d 996 (6th Cir.1992); and *Duran v. Carruthers,* 885 F.2d 1485 (10th Cir.1989). Ms. Alexander was responsible for the medical claims in this case.

Stefan Presser is the Legal Director ·of the American Civil Liberties Foundation of Pennsylvania. He has litigated the following cases involving prisoners rights and/or institutional reform: *Medina v. O'Neill,* 589 F.Supp. 1028 (S.D.Tex.1984) (forcing the closing of the nations's first for-profit prison), *Quinlin v. Estella,* Civil Action No. H–78–2117 (S.D.Tex.1978) (securing equal protection for women incarcerated within the Texas Department of Corrections with regard to educational and vocational opportunities), *Peterkin v. Jeffes,* 855 F.2d 1021 (3d Cir.1988) (improving conditions of confinement for Pennsylvania death sentenced inmates), and *Arbogast v. Owens,* Civil Action No. 1–CV–89–1592 (M.D.Pa.1989) (requiring the Pennsylvania Department of Corrections to unshackle two thousand prisoners in the aftermath of the Camp Hill riot).

Angus Love is the Director of the Pennsylvania Institutional Law Project, a statewide organization that litigates prisoner rights suits. He has litigated numerous prisoner rights cases including *Hassine v. Jeffes,* 846 F.2d 169 (3d Cir.1988).

Robert Meek is the managing attorney of the Philadelphia Office of the Disabilities Law Project and an expert in the area of mental health and mental disabilities. He has litigated several cases on the rights of patients at state mental hospitals and has presented several lectures on the rights of mental patients.

Scott Burris is an Associate Professor of Law at Temple University Law School. Previously, he was staff counsel to the American Civil Liberties Union Aids and Civil Liberties Project. He has litigated numerous AIDS related lawsuits including *Scoles v. Mercy Health Corp.* (rights of HIV-infected surgeon) and *Starkey v. Matty* (rights of HIV-

infected inmates at Delaware County Prison). He is the author of *AIDS Law Today: A New Guide for the Public* (1993) and *Prisons, Law and Public Health: The Case for a Coordinated Response to Epidemic Disease Behind Bars,* 47 U.Miami L.Rev. 291 (1992).

David Fathi graduated from law school in 1988. He was a staff lawyer at the National Prison Project of the American Civil Liberties Union Foundation during this litigation. He has assisted on the briefing in a number of Supreme Court cases, including *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) and *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). He was trial counsel in *Casey v. Lewis,* 773 F.Supp. 1365 (D.Ariz.1991).

The Settlement· Agreement in this case was the result of arm's-length negotiations by highly experienced and able counsel. In light of the extensive negotiations between highly competent and qualified counsel, the .Court finds that counsel's recommendation that the Settlement Agreement should be approved is entitled to great weight.

## IV. CONCLUSION

The case was instituted more than four years ago with the goal of addressing conditions at state correctional institutions throughout the Commonwealth of Pennsylvania. After extensive discovery and numerous proceedings in this Court, the parties began settlement negotiations which led to a settlement.

The Settlement Agreement provides substantial benefits to the plaintiff class, some of which have already been received. Because the dismissal under the Agreement is without prejudice, plaintiffs are able to reap the many benefits that will accrue as a result of the settlement and reinstitute suit at any time if they believe constitutional violations remain. On the whole, the Court concludes that the Settlement Agreement is "fair, reasonable and adequate."

The Court takes this opportunity to commend all counsel involved in the case—plaintiffs' counsel, Alvin J. Bronstein, Esquire, Elizabeth R. Alexander, Esquire, and· David Fathi, Esquire, American Civil Liberties Un-

ion Foundation, The National Prison Project; David Rudovsky, Esquire; Stefan Presser, Esquire, American Civil Liberties Foundation of Pennsylvania; Scott Burris, Esquire, Angus R. Love, Esquire, Institutional Law Project; Robert W. Meek, Esquire, Disabilities Law Project; and defense counsel, Francis R. Filipi and Linda C. Barrett, Senior Deputy Attorneys General; and, R. Douglas Sherman, Denise A. Kuhn and Pia D. Taggart, Deputy Attorneys General—for their singular and outstanding cooperation, dedication and wisdom in overcoming the obstacles to settlement. It is particularly noteworthy that the entire case was settled (with the exception of two matters which were reserved for possible future litigation) without the need for judicial findings on the issues of liability and remedy or a consent decree which, under most circumstances, would have involved the Court in the micromanagement of the state correctional system. That course is certainly preferable to the direct involvement of a federal court in a state executive-branch function. Such a settlement, particularly in a case as complex as this one, represents an outstanding accomplishment by counsel and is of manifest importance to all citizens of the Commonwealth of Pennsylvania.

For all of the foregoing reasons, the Court, pursuant to Federal Rule of Civil Procedure 23(e), approves the Settlement Agreement and finds that adequate notice has been provided to all class members.